UNITED STATES, Appellee

v.

GEORGE I. NASH, Private E–2, U. S. Army, Appellant

5 USCMA 550, 18 CMR 174

J. Franklyn Bourne, ESQ, Lt Col Joseph L. Chalk, U. S. Army, Capt Frank C. Stetson, U. S. Army, 1st Lt Norman W. Polovoy, U. S. Army, for Appellant.

Lt Col Charles M. Munnecke, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

### I

The accused in this case stands convicted by a general court-martial of stealing a $100 money order from a United States Army Post Office; forging a signature thereto; uttering a forged document; and stealing an unopened letter. The particular crimes were charged as violations of Articles 121, 123, and 134, Uniform Code of Military Justice, 50 USC §§ 715, 717, 728, respectively. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for four years. Intermediate appellate authorities affirmed the findings and the sentence and his petition for review to this Court was granted in order to consider two assignments of error advanced by him. The assignments require an answer to the following questions:

1. Did the law officer err in instructing the court that reballoting on the findings was within the prerogative and discretion of the president?

2. Did the law officer, in instructing that the interest of the accused in the outcome of the case could be considered in weighing his testimony, err by giving undue prominence to such testimony?

For purposes of clarity, we include the facts pertinent to each question as it is considered. Since our holding on the first issue requires a reversal of the findings and sentence we discuss the second question only for the future guidance of law officers.

### II

The record shows that after the court-martial had closed to deliberate and vote on the findings, and had been in closed session for some three and one-half hours, the president requested that the law officer reopen the court so that further instructions could be received. Of the three points which were not clear to the members only one is of importance to this discussion. The pertinent questions asked and the law officer's answers are reproduced from the record:

"PRES: Members of the court have a question or so.

"LO: Proceed.

"MC: What is meant by two-thirds majority?

"LO: Two-thirds majority means just exactly what it says—two-thirds of the court. But you are speaking, I suppose, with respect to the number required to convict, because that is where your two-thirds, or at least your two-thirds majority comes into play. Two-thirds of six is four—of seven, that's four and six-tenths, approximately, which means a minimum of five.

"MC: Is that to be reached on one ballot?

"LO: It is within the discretion of the president of the court with respect to discussion and whether there

should be one ballot, or more than one ballot or not. It is generally suggested that there be discussion among members of the court. With respect to the discussion—there should be one ballot. As to whether there should be more than one ballot, that would be within the discretion of the president of the court.

"PRES: What I am arriving at is whether the majority, but not a sufficient majority, that is, not a two-thirds majority—is that an acquittal or is it not?

"LO: It requires two-thirds of the court, a minimum of two-thirds of the court to convict upon any charge or specification. It requires a minimum of this court here, since there are seven members, a minimum of five members voting for a conviction to convict, and less than that is an acquittal. With respect to further discussion on any balloting, irrespective of what the further balloting happens to be on any specification or all specifications, it is within the prerogative of the president of the court whether he wants further discussion, reballoting, or further reballoting. That's within his prerogative and discretion."

The answers of the law officer to the questions asked present us with two problems. First, whether more than one ballot may be cast in voting on the findings; and, second, if the first or any subsequent ballot is questioned by any member and an additional ballot is requested, who is clothed with the authority to rule with finality on the request?

### III

The Uniform Code of Military Justice is silent on the first facet of the problem so we are not faced ■ with any conflict between that act and the provisions of the Manual for Courts-Martial, United States, 1951. In paragraph 74*d* (3) of the Manual we find what is good authority for the casting of more than one ballot. That paragraph reads in part:

". . . A finding of not guilty results as to any specification or charge if no other valid finding is reached thereon; however, a court may reconsider any finding before the same is formally announced in open court. The court may also reconsider any finding of guilty on its own motion at any time before it has first announced the sentence in the case."

The procedure outlined by the Manual is the only one consistent with a proper and careful consideration of guilt or innocence. An accused's life or liberty should not be taken without a full and fair opportunity on the part of all court-martial members to exchange their points of view and to persuade others to join them in their beliefs. If an accused interposes any sort of valid defense, as he did in this case, there is apt to be some difference of opinion as to wherein the truth ultimately lies. That is historically true of juries in the civilian courts and, while with them it is generally required that the vote be unanimous, either for conviction or acquittal, it is not unusual for a number of ballots to be cast before a verdict is finally reached. In addition, it is not unusual for the complexion of the voting to change as the respective ballots are taken. Although unanimity is not required under our system, there still exist many valid reasons for allowing the casting of more than one ballot. Without enumerating any, we may state generally that they relate to the desirability of having the theories for both the prosecution and defense weighed and debated thoroughly before final judgment, for it cannot be disputed that justice is more likely to be administered if full and free discussions are not automatically cut off just because a vote has been recorded. Since the Manual language is consistent with good civilian and military practice, and since it announces principles which underlie a fair and just trial, we support it and, therefore, find no fault with the law officer's instructions on that point.

### IV

We hold differently, however, with

regard to his answer that it is discretionary with the president ■ of the court-martial whether there should be more than one ballot. Here again the Code does not specifically answer the question. However, we have no doubt that it inferentially sets out the correct procedure to be followed. After establishing in subparagraphs (a) and (b) the voting requirements for conviction and sentencing, Article 52 of the Code, 50 USC § 627, provides in subparagraph (c) that all other questions to be decided by the members of a general or special court-martial shall be determined by a majority vote. When this Article is interpreted together with the provisions of the Manual to the effect that the court may reconsider any finding before it is announced in open court, it follows that this is a question to be decided by the members. Counsel for the Government advance no argument to the contrary and we find no basis for any.

The identical question was presented to a Navy board of review in United States v. Henninger [NCM 166], 7 CMR 444. In arriving at the conclusion we reach here, the board of review said:

". . . The president is the presiding officer in proceedings in closed court and has power to make reasonable rulings on certain procedures, but Paragraph 74(d)3, MCM, 1951, specifically states that the *court* may reconsider any finding before the same is formally announced in open court. The decision to reconsider is one for the court as a whole and not for the president *alone*. He may, as may any other member, ask for reconsideration prior to the announcement in open court, but he cannot order or coerce a vote in reconsideration."

We have no doubt that the provisions of the Code and the Manual on this point of procedure were intended to prevent the senior member of the court-martial from exercising any undue influence on the findings or sentence of the court. To allow him to be the sole judge as to the number of ballots to be taken would run counter to that policy. It is true that he is given some powers and responsibilities over and above those of the other court-martial members, but they are principally duties placed on a presiding officer. For example, in regard to voting and findings, he decides the order in which offenses shall be voted on, where more than one is to be considered; if additional instruction is needed, he requests that the court be opened and he speaks for the court-martial members; and he announces the vote and sentence. In those matters he is the military counterpart of the civilian foreman of the jury. But in all matters where a ballot may fix the guilt or innocence of an accused, his vote is equal to, but no greater than, that of the other members (paragraph 41b of the Manual). In those instances, his position, rank, or authority cannot be employed in any manner which will directly or indirectly influence the voting of his fellow court-martial members.

Government counsel seek to avoid the effect of the erroneous ruling of the law officer by contending ■ that no prejudice resulted. We are not convinced by the arguments advanced. It is entirely probable that the incorrect response of the law officer may have caused the conviction of the accused on one or more of the specifications. Since the percentage of votes necessary to convict on all specifications had not been reached when the court opened, he stood acquitted of some offense unless a subsequent ballot changed the result. He had a right to have the question of whether there should be further voting decided by a majority vote of the court-martial members and he was denied that right. One man was granted the power that vested in four or more. It can be reasoned that if a majority had voted for acquittal on one or all specifications, the same majority would doubtless have voted against another ballot on the findings. Yet under the authority given the president, the desires of a majority could be ignored and he, by repeatedly calling for another ballot, could coerce a finding satisfactory to himself. What transpires in a closed session must re-

main inviolate and we have no way of ascertaining precisely what did happen in this instance; but when an accused has been denied the collective judgment of a majority working in a secret session and he is precluded from ascertaining what occurred, he is the victim of an error which materially prejudices one of his substantial rights. From the foregoing it follows that the findings must be reversed.

The second issue granted merits discussion at this point although our previous holding disposes of the case. After instructing generally on the credibility of witnesses, the law officer stated:

". . . The defendant is permitted to become a witness in his own behalf, but in weighing his testimony you have a right to consider that he is a highly interested witness and very much interested in the outcome of the case."

Appellate defense counsel maintain that undue prominence was thereby given to the possibility that the accused's testimony was unreliable, and that prejudice to him resulted. We believe the general principles of law in the civilian courts, both Federal and state, on this point should be used in the military judicial system. Generally, it is that the testimony of an accused, when he elects to take the stand and testify in his own behalf, is to be regarded in the same light as that of any other witness. Alexis v. United States, 129 Fed 60, (CA 5th Cir). In instructing the jury concerning credibility of witnesses, the judge may state that the interest of any witness in the outcome of the case may be taken into consideration by them in assessing the reliability of his testimony and this rule applies to the accused in a criminal case. Bridges v. United States, 199 F2d 811 (CA 9th Cir); Fisher v. United States, 149 F2d 28 (CA DC Cir); United States v. Freedman, 268 Fed 655 (ED Pa); Belvin v. United States, 260 F 455 (CA 4th Cir); Reagan v. United States, 157 US 301, 15 S Ct 610, 39 L ed 709. Of course, it is necessary that the court members be informed that the principle is applicable to an accused and this

requires that he be specifically mentioned. However, he ought not to be singled out by comments which indicate that because he has an interest in the outcome of a case the court-martial members should disregard his testimony. Neither should the law officer submit an instruction which is so one-sided against him that it destroys the privilege of being a witness in his own behalf. Allison v. United States, 160 US 203, 16 S Ct 252, 40 L ed 395; Hickory v. United States, 160 US 408, 16 S Ct 327, 40 L ed 474. Perhaps the most appropriate way for the law officer to proceed is to give a general instruction on the effect of any interest or bias on the testimony of witnesses and then inform the court-martial that the rule as announced applies with equal force to the accused. However, most jurisdictions permit an instruction similar to the one given here and if the language used by the law officer had not been so unduly emphatic about the nature of an accused's interest, we would not have granted review on this issue.

While we have issued a caveat against the particular language employed in the charge to the court-martial we find no prejudice in the instruction given here. It came at the end of a series of instructions on credibility of witnesses and it blended into the general subject matter. Common sense dictates that an accused has an interest in the outcome of a prosecution against himself and the court members would be cognizant of the fact without being told. The emphasis employed by using the adjectives "highly" and "very much" in the instruction would not affect the members in their deliberations.

The record is remanded to The Judge Advocate General of the Army and a rehearing is ordered.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring):

On the central issues of this case I agree fully with my brothers. However, one small matter troubles me. The principal opinion suggests, probably by way of dictum, that a majority of

the membership of a court-martial may compel a revote—or, at least, may determine whether a further vote is to be taken. This conclusion is grounded—certainly with superficial solidity, at least—on the provision of Article 52(c) of the Code that, "All other questions [that is, other than those mentioned in earlier parts of the Article] to be decided by the members of a general or special court-martial shall be determined by a majority vote."

My difficulty arises from the circumstance that previous provisions of the same Article demand a two-thirds—or an even greater—vote of the members of a military court to convict or to impose sentence. It is clear that these requirements extend beyond "a majority vote." Yet, if a simple majority may lawfully compel revote after revote, it is manifest that the difference between the two provisions narrows. Indeed, the danger threatened is akin to that presented by the instant case through permitting the president to force a series of reballots. It must be apparent that protracted revoting may, as a practical matter, frequently serve to defeat the Congressional intent that a two-thirds—or, in specified instances, a greater—majority be secured to support findings of guilty or a sentence determined by the court-martial.

The problem of reconsideration has often been discussed by writers on parliamentary law. It appears that they agree that reconsideration of an assembly's action requires no more than a majority vote—this despite the fact that the decision concerned demands the approval of two-thirds of the body. See, e.g., Robert's Rules of Order, 1943, § 36, page 158; Sturgis Standard Code of Parliamentary Procedure, 1950, page 166. The Rules of Procedure obtaining in both the Senate and the House of Representatives accord with this view. Rules and Manual, United States House of Representatives, 1949, § 817, page 409.

In parliamentary law, however, a not ineffective safeguard is provided against a tyranny of the majority as to matters—as, for example, approval by the Senate of a treaty—with respect to which more than "a majority vote"

is required to support a course of action. There, the movant for reconsideration—and perhaps he who seconds as well—must have voted *with* the side which previously prevailed. Robert's Rules, supra, page 156; Leigh, Modern Rules of Parliamentary Procedure, 1937, Rule 49; House Rules, supra, Rule XVII, page 409; Senate Rules, supra, Rule XIII; but cf. Sturgis, supra, page 163. In this way reconsideration may be avoided, unless there exists a substantial possibility of a different vote. However, a similar provision with respect to reconsideration by a court-martial is unworkable—even impossible—since the original vote must have been taken by secret written ballot, and his own action may not be revealed by a member, even within the confines of the tribunal's closed deliberations. Cf. Article 51(a). Thus to determine, within standard parliamentary criteria, the right of a member to move for reconsideration would require that he divulge unlawfully the nature of his vote.

Since I agree with my brothers that the members of a court are not bound irrevocably by an initial vote taken during closed session, and yet because I doubt that a simple majority properly may compel reballoting, I am confronted by some sort of dilemma. The only solution which occurs to me is the one I shall set out below. Under its terms, *any* member of a court-martial may propose reconsideration. The reconsideration itself, however, must be determined by the concurrence of a sufficient number of members to require the adoption of a conclusion different from that originally approved by the court. This would mean—if there had previously been a vote to acquit—that a revote may not be compelled in the absence of agreement of two-thirds of the court's membership. If the offense carries a mandatory death penalty, then it would be demanded that every member concur in the proposal to reconsider. Cf. Article 52(a)(1). Similarly, if the prior vote had been to convict, then—save in the instances covered by Article 52(a)(1)—more than a one-third vote would be needed for a reballot. Like rules would obtain as to sentencing procedures—the vote necessary for recon-

sideration being dependent on that demanded under Article 52 for the sentence first agreed on.

Since the proposed procedure is in my view the one most consistent with the several policies of the Code operative in this area, I am convinced that it must be the one intended by Congress—if in any valid sense it can be asserted that its members possessed specific intent with respect to this problem. Therefore, I am sure that a *modus operandi* such as I have described is the one on which the law officer should instruct when a question of reconsideration is presented. Only in this manner, I believe, may the conflict found in Article 52 be resolved sensibly.