UNITED STATES, Appellee

v.

MAX S. OLVERA, Private First Class, U. S. Army, Appellant

4 USCMA 134, 15 CMR 134

No. 2761

Decided April 9, 1954

Robert E. Myers, Esq., Lt Col Edgar R. Minnich, U. S. Army, Capt William C. Irby, Jr., U. S. Army, and 1st Lt Alexander J. Jemal, Jr., U. S. Army, for Appellant.

LT COL Paul J. Leahy, U. S. Army, and 1ST LT Donald M. Sukloff, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused, Olvera, was tried and convicted by an Army general court-martial sitting in Germany of a violation of the Uniform Code of Military Justice, Article 128(b)(2), 50 USC § 722, in that he committed an aggravated assault on the person of one Lockhart, by cutting him about the face and body with a knife, thereby intentionally inflicting grievous bodily harm. The court sentenced him to be confined at hard labor for four years, to forfeit all pay and allowances, and to be dishonorably discharged. The convening authority approved the findings and the sentence. A board of review in the office of The Judge Advocate General reduced the findings to those of guilty of assault with a dangerous weapon—this for the reason that the law officer had failed to instruct on that lesser included offense, and as well to advise the court-martial that its members might properly consider certain evidence of amnesia as bearing on specific intent. Accordingly, the sentence in its confinement aspect was pared to three years. By petition the accused has raised the question of whether the evidence adduced by the defense required the law officer to instruct on the effect of unconsciousness, or "mental blackout," on general criminal responsibility.

## II

The testimony elicited at the trial indicated that on the evening of November 16, 1952, the accused—together with two friends, the victim of the assault and one Emory—returned to their Army post following an evening's revelry. During the course of the evening, the party had consumed substantial quantities of alcoholic liquor. However, little evidence was adduced indicating the presence of pronounced symptoms of drunkenness. On entering the orderly room of their organization, Lockhart approached the register to enter his name. The accused offered to accomplish this task for Lockhart, but the latter declined. For reasons enshrouded in some mystery, this refusal precipitated a brief scuffle, at the end of which Lockhart discovered that he had received a stab wound in the lower left chest and other knife wounds on the nose and left cheek. These wounds necessitated major surgery of an emergency character.

While none of the other witnesses observed that severe blows were inflicted on the accused, he testified that he had been struck one or more times on the head, and that thereupon he had lost all recollection temporarily. When his memory returned, he found himself standing with a knife in his hand, and observed that Lockhart was oozing blood. According to the accused, it was not his custom to carry a knife, but on the day in question he had found the one he used, and, without consideration, had pocketed it. This weapon was admitted in evidence and is described as a two-bladed knife—the longer blade being some three and one-eighth inches in length. "It is not a switch blade knife, and it must be manually operated." We infer from this description that the weapon used was of the sort usually referred to as a pocket knife.

The defense offered the testimony of one Lieutenant Crandall, a medical officer, who had assisted in the repair of Corporal Lockhart, the victim of the accused's assault. This officer testified in answer to a hypothetical question that, if in an affray one were to receive a severe blow in the region of the temple, it is "possible that the recipient of such a blow can be so dazed thereby momentarily or longer as to be deprived of any conscious intent to commit a particular act." Lieutenant Crandall, answering a second hypothetical question, indicated that under such circumstances, it is "possible that the recipient of such a blow in the same place, temporarily or momentarily at least, would not know what he was doing and would not know the consequences of his act." However, the physician had observed

the accused shortly after the incident, and had noticed no marks or bruises of the sort which might be expected to result from the severe impacts referred to in the hypothetical questions. The accused admitted on cross-examination that he had not sought treatment for the head injuries he claimed. Lieutenant Crandall also pointed out that acts, performed in the "dazed condition" referred to in his responses to hypothetical questions, would probably have been "poorly executed"—by which he appeared to mean that they would have been "slow" and "somewhat incoordinated." The accused presented no evidence of past "blackouts" nor of prior mental abnormality of any sort. Moreover, he offered no medical testimony to supplement Lieutenant Crandall's responses to the hypothetical questions reported above.

### III

The defense position appears to be based on the notion that amnesia—*qua* amnesia and without more—must be identified with legal insanity. Thus, if an accused is genuinely unable to recall transactions which took place during a certain period of time, he must necessarily have been unable during the same period either to form a criminal intent, or to distinguish right from wrong. In other words—we are told by counsel—if one is totally unable to remember events, it is impossible, or at least highly improbable, that a condition of legal sanity could have existed during the "blackout" interval. This position requires careful scrutiny in light of the pronouncements of modern psychiatry.

Reported incidents concerning so-called "loss of memory" are familiar to most persons. A typical case may be said to involve the hitherto normal person who, following receipt of a severe head injury, is quite unable to identify himself, or to remember other facts of his life prior to the impact producing the harm. It appears that an amnesic condition may derive from a variety of sources, and may be either temporary or permanent in character. Perhaps to the layman a certain validity may in-

here in the view that one must not be held accountable criminally for acts performed in such a state. By what logic—it will be asked—may one be held responsible legally for conduct of which he is "unconscious"? Yet we are assured by medical science that by no means in every instance should amnesia be deemed to negate mental responsibility and legal accountability for episodes which lie outside recollection. Psychiatry in Military Law, TM 8–240, AFM 160–42, paragraph 12*h*; Davidson, Forensic Psychiatry, pp 15–17. The first-named source, for example, offers the case of a soldier who attempts a rape during a time period characterized by a genuine and total amnesia resulting from alcoholic intake. The account proceeds:

". . . When she screamed, he jumped over the fence and, by a circuitous route, eluded his pursuers, reached the post, and went to his quarters . . . In this case, he would be mentally responsible for his crime because, within the framework of his pathologic intoxication, he acted as if he were conscious of having done something wrong. He fled when the girl screamed, he ingeniously eluded pursuit. Thus the amnesia, by itself, is no evidence that he did not realize he was doing something wrong. And the fact that he abandoned his attempt when confronted with opposition clearly shows that he could 'adhere to the right.'" [Paragraph 12*h*, TM 8–240, AFM 160–42. See also Davidson, Forensic Psychiatry, supra.]

By way of contrast, the same Army and Air Force Manual presents a further instance involving an enlisted man who, long after midnight, roamed noisily through his barracks and proceeded to· a clothesrack. As he walked he lurched against several bunks, awakening their occupants. Finally, at the clothesrack, he rifled the clothing he found there and removed several items of property from the trousers of a fellow soldier. He denied recollection of the event. The Manual continues:

". . . Further inquiry disclosed somnambulism in childhood, and an

electroencephalographic record was characteristice of psychomotor epilepsy. In this case, it is apparent that the somnambulistic personality had no consciousness of doing anything wrong. He made no effort to walk silently or to move furtively. He did not realize that what he was doing (within the framework of his somnambulism) was something wrong. This was because of a mental disorder (psychomotor epilepsy.) Accordingly, he was *not* mentally responsible."

In this situation it appears that the amnesia was significant only as a symptom confirming *other* evidence to the effect that the accused did not know the nature and quality of his acts during the period for which he lacked recall.

Too, the Manual for Courts-Martial, United States, 1951, paragraph 120*b*, points out that even

". . . mental disease, as such, does not always amount to mental irresponsibility. For example, if a person commits an assault under psychotic delusion with a view to redressing or revenging some supposed injury to his reputation, he is nevertheless mentally responsible if he knew at the time that the act was contrary to law, and if he was not acting under an irresistible impulse."

Thus, even a person who has lost contact with reality to the extent of developing a "psychotic delusion" may be held criminally accountable if—within the framework of this delusion—he recognized that he was engaged in the performance of an act considered reprehensible by society. When for a delusion of this character we substitute a mere temporary amnesia, it would seem to follow that legal responsibility must be appraised in accordance with the framework within which the subject was acting at the time. This is particularly true for the reason that—as we shall point out later—an amnesia may stem from disorders distinctly less severe than a psychosis. It must be readily apparent that amnesia, *by and of itself*, will afford but scant insight into the framework within which the "secondary personality" is acting.

Medical sources inform us that there are "commonly six possible clinical explanations for a period of alleged amnesia." Those are: (1) Hysteria; (2) Psychosis; (3) Alcoholism; (4) Head injury; (5) Epileptic fugue; (6) Malingering. Psychiatry in Military Law, supra, paragraph 12*b*. Accord: Davidson, Forensic Psychiatry, pp 15–17. It is obvious that malingering cannot be permitted to affect criminal accountability—for the accused is exculpated in no degree by conscious falsehoods concerning memory loss. On the other hand, an epileptic fugue would tend strongly to reflect an absence of criminal liability—because an epileptic, during a seizure, is ordinarily acting with virtually complete automatism. If the amnesia were determined to spring from a psychotic condition, it would, of course, be symptomatic of a loss of contact with reality, which may have operated to deprive an accused person of ability to distinguish between right and wrong as to the acts committed, or to adhere to the right. However, conceding the establishment of a psychosis, it would not *necessarily* suggest freedom from criminal liability—since, as previously observed, the subject's responsibility must be evaluated within the framework of his psychosis and the delusions or hallucinations created by it.

Amnesia consequent upon a head injury is of special interest in the case at bar, since the accused has claimed that he received several blows to the head before he lost recollection. We are assured that an accused is not to be exempted from liability for an assault merely because, during its course, he received a head injury which produced a retrograde amnesia concerning the assault. Psychiatry in Military Law, supra, paragraph 12*f*. The correctness of this result seems clear if the assault be consummated prior to the transaction which produces the amnesia—whether that event be roughly contemporaneous or transpired at any later date prior to trial. However, in the case at bar the court—under proper instructions—might have concluded that, although the accused was not initially the aggressor, he assumed this role through use of his knife, which clearly

constituted an excess of defensive force. Since the head injury—if sustained in fact—appears to have been incurred prior to the use of the knife, it would under this interpretation, have preceded the commission of any assault by the accused. Thus, the accused would have merited acquittal (1) if his account of an amnesia were accepted; (2) if the amnesia were considered to have been attributable to head injuries received without fault on his part; and (3) if the hurt to his head were considered to have deprived him of the ability to distinguish right from wrong—as well as to remember the nature of his conduct.

Amnesia due to alcoholism is a possibility also relevant to the instant case—for it is admitted that the accused and his comrades were to some extent under the influence of intoxicating liquor. The mental condition incident to alcoholic amnesia may conceivably be of such a nature as to muddle the subject's thought processes beyond the point at which he is able to entertain a specific intent or to premeditate. See Manual, supra, paragraph 154$a$(2). If the accused lacked a specific intent or premeditation for whatever reason, it is clear that he may not be convicted of an offense of which such a mental state is a necessary element. Thus, in the case at bar, Private Olvera could not lawfully have been convicted of assault with intent to inflict grievous bodily harm had the court-martial considered that, by reason of drunkenness, he was unable to entertain such an intent. In this connection, we note that no instruction was supplied by the law officer concerning the significance of alcoholic intoxication with respect to specific intent, nor as to the existence of the lesser included offense of assault with a dangerous weapon—a crime which required no such intent. The Manual, supra, consistent with general law, provides that:

"A temporary loss of reason which accompanies and is part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement is not insanity in the legal sense. It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition . . ." [Paragraph 154$a$(2).]

If, while highly and voluntarily intoxicated, an accused were to knife a companion and could remember having done so—and if no further evidence of mental condition were adduced—it is indisputable that he might lawfully be convicted of assault with a dangerous weapon. What essential difference must be deemed to exist once we assume that he cannot recall the knifing? None whatever, we believe. Literally nothing has been brought to our attention which indicates that one who "blacks out" when drunk is more probably suffering from a "mental defect, disease or derangement," within the meaning of the Manual—or indeed that of the law of the civilian community—than one who, however intoxicated, possesses a clear and distinct recollection of events. We are certain indeed that we would be adding an unwarranted gloss to the Manual were we to hold that drunkenness is an excuse for crime, provided only that the accused was sufficiently intoxicated to blot from his mind all memory of the facts of the offense.

The final amnesic category—that due to hysteria—may also be related to the phenomena of the instant case, on the assumption, of course, that the accused's claim of memory loss is genuine. In connection with hysteria, however, it has been pointed out that not infrequently amnesia is precipitated by the very commission of crime—and thus is to be regarded as in no sense symptomatic of a deranged mental state destructive of criminal responsibility. Psychiatry in Military Law, supra, paragraph 12$b$. Whatever its ultimate value as a psychiatric method, Freudian psychology has served to underscore the notion that individuals often possess memories so unpleasant and unsavory that, as a measure of self-protection from guilt feelings, they are thrust from the conscious into the unconscious sphere of the mind. Thus it becomes difficult to unearth these ideas —for the reason that a dynamic and uncontrollable force is exerted to pre-

vent their breaking through into the conscious mind.

Not uncommonly, after a particularly heinous act—say one of rape, murder or aggravated assault—the subject suffers a genuine "blackout," and cannot consciously remember perpetrating the terrible deed. He is, in fact, quite sincere in asserting that he does not remember—for, so far as his conscious mind is concerned, he is wholly bereft of recollection. Yet there was no difficulty at the time—and with respect to the act done—in discriminating between right and wrong and adhering to the former. If anything, the guilt feeling which serves to produce the repression actually reflects the circumstance that the individual, in a very real sense, originally "knew" the deed to be wrong—and yet chose to perpetrate it. Indeed, he does not wish to live with the recollection—and thus, to avoid anxiety, he buries it mentally. 1 Gray, Attorneys' Textbook of Medicine, 3d ed, § 96.15. Only by extensive psychoanalysis—or through narcosynthesis and the use of the so-called "truth drugs"—may the repression be removed and the recollection returned to consciousness. The authors of the Army and Air Force Manual, supra, have this to say in paragraph 12c:

> "Hysteria should be reflected in the total life pattern of the accused. A person who never had a hysterical fugue until he committed a crime usually is held accountable, since in most cases the criminal act precipitated rather than followed the hysterical fugue . . . A diagnosis of hysteria should not be based solely on the alleged amnesia which covers the period of the crime. It should be based on sound clinical judgment, taking into consideration the general life pattern of the individual."

In this type of amnesia—and in the absence of a history of hysteria or related disturbed states—we find nothing which impairs criminal responsibility. This is true because the individual affected was at the time of the conduct in question able to distinguish right from wrong and to adhere to the right. His own recognition of guilt, and that alone, functioned to create the "mental block"—that is, to establish the amnesia. In this context, the memory loss, if anything, supports the conclusion that the subject was wholly responsible for his actions in law—not the converse.

## IV

In light of the foregoing discussion, we have scrutinized the record with care in an attempt to discover whether evidence adduced at the trial served to raise the issue of mental responsibility. The accused alone testified to the receipt of severe blows to the head—yet the single medical witness who had observed him, and whom the defense adopted as its own, was quite unable to recognize the presence of bruises. No history of mental disease was shown. No evidence was presented of prior "blackouts" on the accused's part, nor of epileptic tendencies in any degree. Since he had denied prior ownership or use of cutting instruments, or experience therewith, it is difficult to comprehend how—in the course of a brief scuffle—the accused was able to extract a knife from his pocket, open the blade, and inflict severe injuries, yet to accomplish the entire process automatically. While we cannot characterize the accused's story as inherently improbable in any precise meaning of the term, we cannot avoid the conclusion that—even if accepted in every detail—the accused signally failed to link his amnesia to any type of automatism, or to demonstrate that the deftly executed slashing of his victim was related in any way to a "mental defect, disease or derangement" depriving him of legal responsibility.

As to the authorities cited by defense, we observe substantial distinctions. In one case, for example, evidence—including the testimony of four physicians—indicated that, at the time of the alleged homicide, the accused was unconscious by reason of epilepsy, from which he had suffered acutely since he was nine years of age. People v. Freeman, 61 Cal App 2d 110, 142 P2d 435. When the "blackout" is thus specifically related by competent testimony to the syndrome of epilepsy, we too would have no hesitation in concluding that the

issue of mental responsibility had been raised. In a further case relied on by the defense, the evidence to support the claim that the accused had acted solely by reason of automatism, and in a completely unconscious condition, included medical testimony indicating that he had received four substantial cuts on his forehead, together with a showing of substantial bleeding from the right ear and superficial bruises on the abdomen. It seemed, in fact, that he had received a brain injury. The opinion was expressed that the accused's loss of memory was distinctly caused by blows to the head, and that even at the time of trial he was suffering from some variety of amnesia. People v. Cox, 67 Cal App 2d 166, 153 P2d 362. On similar evidence we also would suppose that the defendant had made a substantial showing that his amnesia was symptomatic of a type of mental disorder which might conceivably affect his ability to distinguish right from wrong and to adhere to the right. Thus instructions on mental responsibility would be demanded. The case at bar offers nothing similar.

These California cases also involve the application of a California statute exempting from criminal accountability persons "who committed the act charged without being conscious thereof." Of course, in light of modern psychiatric teaching having to do with the dynamics of the mind, we would be reluctant to take the position that "consciousness," as a matter of statutory interpretation, necessarily required a recollection of the events which had occurred. In truth, we would suppose that the California courts would take a similar view, since they have held repeatedly that unconsciousness, if produced by voluntary intoxication, does not render one incapable of committing a crime. People v. Taylor, 31 Cal App 2d 723, 88 P2d 942; People v. Sameniego, 118 Cal App 165, 4 P2d 809, 5 P2d 653. In any event, we are not confronted by the need to interpret a statute of the California genre.

A Colorado case is also cited by defense counsel in support of their proposition that the evidence of amnesia in the case at bar operated to raise the issue of want of mental responsibility. Read v. People, 119 Colo 506, 205 P2d 233. In reversing because of the trial court's failure to furnish requested instructions on lesser degrees of homicide included within first and second degree murder, the court there emphasized the fact that nothing in Colorado's criminal practice is "more thoroughly established or definitely settled than the principle that when there is any evidence, however improbable, unreasonable or slight, which tends to reduce the homicide to the grade of manslaughter, the defendant is entitled to an instruction thereon upon the hypothesis that the same is true." The court's account of the defendant's substantially uncontradicted testimony concerning the events preceding the homicide reveals substantial support for the conclusion that at the time of the shooting she was unable, by reason of mental disorder, disease or derangement, to distinguish right from wrong and adhere to the right— and that her "blackout" resulted from the same disorder, disease or derangement. We conclude that this case— viewed in the context of the Colorado court's basic approach together with the evidence of record—can have little relevance to the matter at hand.

So much for the cases cited by defense counsel. Our conclusion is that amnesia, to be of significance in the requirement of instructions, must be linked to other evidence—evidence suggesting, in some measure at least, the existence of a mental state which would serve to negate criminal responsibility. Of course, if linked with intoxication, it will be of value as showing that the accused may have been so drunk that his mind could not harbor intent, premeditation, or some essential sort of knowledge. It seems that the board of review took this possibility into account in reducing the court-martial's findings to those of guilty of assault with a dangerous weapon. However, in our view amnesia plus intoxication in no wise equates to an issue of legal sanity. Indeed, amnesia is—in and of itself—a relatively neutral circumstance in its bearing on criminal responsibility. Cf. Gray, supra, § 96.01, page 924.

## V

That which we have ushered out the front door, it is now proposed we should return through the rear. ■■■■■■ ■ Thus, it is intimated that loss of memory while not affecting legal responsibility for crime, does indicate an inability to cooperate rationally in one's defense. See United States v. Galla [ACM 83], 1 CMR (AF) 77. Distinctly we do not propose to grant that effect to a claim of amnesia without more. If the condition were the product of alcohol or of hysteria, to conclude that it protects the accused from trial would be tantamount to a holding that amnesia negates criminal responsibility as an original proposition. And we cannot at all so hold. Moreover, we believe that the capacity to cooperate in one's own defense is a matter of inquiry directed to disorders existing at the time of trial. The accused may well be characterized by a genuine amnesia as to certain events, yet be able to deal rationally with them, to cooperate with his counsel, and to remember the events taking place at the trial. Since amnesia is not itself a disease but rather a sympton, in the imagined case all psychiatrists would be in accord in holding the accused to be completely rational, and wholly free from disorder as of the time of the trial. Yet under the suggested view, the court-martial could not proceed to trial because the accused had not fully recovered his memory of events—and perhaps would never recover it.

Concededly, such an accused is at some disadvantage—for, if innocent, he does not demonstrate that quality by testimony that he "blacked out" and does not remember. However, he is still quite competent to assume the witness stand, and to assure the court that he does not remember—and he is certainly able to analyze rationally the probabilities of his having committed the offense in light of his own knowledge of his character and propensities. If his amnesia be rooted in some fundamental mental disorder existing at the date of the acts charged, he will also be able to raise the possibility that he was not mentally responsible at the time. This we conclude—after indul-

gence in a weighing process—affords him sufficient protection.

Moreover, he will presumably be able to remember whatever punishment he may receive—with the result that its deterrent effect will be present as to future danger of criminal promptings. All in all, and on balance, we must conclude that a person who does not recall accomplishment of the acts alleged is not by that fact exempt from trial. However, were it to be shown by competent medical testimony that the amnesia is no more than temporary, and may be expected shortly to disappear, we would suppose that a proper exercise of judicial discretion would demand the allowance of reasonable continuances to effectuate the recovery of memory.

## VI

Having examined the record with care to determine whether the issue of mental responsibility was raised at the accused's trial, and having decided in the negative, we must affirm the decision of the board of review.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in part and dissenting in part):

I concur generally with the majority opinion. However, I dissent from that part which refuses to recognize true amnesia as a basis for deferring further proceedings against an accused.

Without attempting to define its limits, a condition of true amnesia would seriously circumscribe the accused in his defense against a charge setting out a specific intent. In many such cases the circumstances suggest the intent charged, but the accused's denial under oath that he possessed that intent is sufficient to raise an issue. See United States v. Williams, 1 USCMA 231, 2 CMR 137; United States v. Smith, 2 USCMA 312, 8 CMR 112. How then can the accused possibly say that he did not entertain the intent charged if he truly has no recollection of the event? Consequently, it seems to me that an honest claim of true amnesia, supported by competent independent testimony, is "reasonable

**142**

cause" for an application for a continuance. See Manual for Courts-Martial, United States, 1951, paragraph 58, page 82.