UNITED STATES, Appellee

v

JERRY M. BOULTINGHOUSE, Technical Sergeant, U. S. Air Force, Appellant

11 USCMA 721, 29 CMR 537

No. 13,982

Decided July 29, 1960

*Major Quincey W. Tucker, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Major Simpson M. Woolf* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hannigan.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted of breaking into a Government building; stealing ten .45 caliber pistols; and absenting himself without authority for a period of six days, in violation of Articles 130, 121 and 86, respectively, Uniform Code of Military Justice, 10 USC §§ 930, 921, and 886. The conviction was affirmed by the convening authority and the board of review. We granted further review to consider the claim that a denial of a defense request for an instruction on the effect of the accused's purported inability to recall a period of time critical to the housebreaking and larceny charges was prejudicial.

During a routine check, Air Policeman Boysen discovered, at about 3:45 a.m., November 16, 1958, that the weapons storage building on the firing range of Lackland Air Force Base had been broken into. An inventory disclosed that ten .45 caliber pistols had been stolen. Accused's connection with the incident resulted from a meeting between him and a Texas highway patrol at about ten o'clock the preceding evening. The accused was stopped for speeding on Highway 81 near Devine, Texas, which is about 30 miles from the air base. As the accused's car came to a stop, certain movements of the accused aroused the suspicion of Patrolman Robie. Accordingly, he checked the floor board of the front of the accused's car. On the right side

he found a half-pint of whiskey; under the driver's seat he discovered a .45 caliber pistol wrapped in a handkerchief. Asked about the gun the accused said it was a service revolver which he had "checked out" at the base because he was going to Mexico and wanted it for protection. Officer Robie returned the pistol to the accused, after writing the serial number on the speeding ticket and on his own records. He did not otherwise search the car. Specifically, he did not look in either the trunk or glove compartment. The serial number recorded by Officer Robie matched that of one of the ten pistols stolen from the base.

Two days after the highway incident a Federal Bureau of Investigations agent, with the accused's consent and in his presence, searched the accused's car. A second pistol, bearing the serial number of another of the stolen guns, was discovered in the glove compartment. After appropriate warning of his right to remain silent, the accused told the agent he recalled being stopped by the Texas highway patrol and that he thought he advised one of the officers that the gun found on the floor of his car "was a weapon . . . [he] had obtained in Korea in 1950." He further maintained he no longer had the gun because he "could have" thrown it into a ditch at the side of the road. Finally, he said: "It is entirely pos-

sible that I broke in the weapons storage building and took the ten guns but I was intoxicated on the night of November 15, 1958 and I do not now recall having done it." Attempting to account for the weapon found by the FBI agent, he reiterated the possibility that he might have obtained it by breaking into the weapons building, but he was "intoxicated" and did not "remember." He represented it was "possible" he disposed of the other guns by throwing them out of his car "somewhere along . . . highway 81 on the night of November 15, 1958."

On November 19, the accused absented himself without authority. He returned to military control on November 25. Sometime later, questioned again about the guns, he orally admitted, in several statements on different days, that during his unauthorized absence he had attempted, but failed, to sell a .45 caliber pistol. He did not remember what he did with that gun. He also accounted with particularity for all of his actions from the morning of November 15 to the early morning of November 16. He maintained he was at the Noncommissioned Officer's Club on the base from about 8:00 p.m. to 8:35 p.m. He then returned to his home, which was off the base, arriving at about 9:00 p.m. Approximately a half-hour later he drove down Highway 81 to a "beer joint" where he stayed only long enough for a "beer and a pack of peanuts." When he left the tavern he drove south until stopped by the highway patrol. After that incident he went to the "Flying Corners." Leaving that place about 11:00 p.m., he returned to the Club and remained until closing, after which he went home. The accused further maintained he had no knowledge about the guns found in his car, but he was "a firm believer in anything being possible," and it was "possible" he might have stolen them. He pointed out that in 1953 at March Field he had suffered from amnesia. He admitted he did not lend his car to anyone and he had no enemies who might "plant" a gun to embarrass him.

The circumstances related above constituted the prosecution's case.

Two witnesses and a documentary exhibit comprised the case for the defense. The first witness was the accused's wife. She testified that she was married to the accused for 22 years. Ever since he returned from combat in World War II he "had trouble with his head." On occasion he seemed to suffer "intense pain on one side of his head," and he could remember nothing of what transpired during the interval of pain. To obtain relief from that condition, the accused "just takes off and goes in the car, drives for a while and then comes back." On November 15, the accused "didn't have much of anything to say" and remarks addressed to him were apparently not "registering." This, in the wife's opinion, was symptomatic of "one of these things" that troubled the accused. The documentary exhibit showed that in 1953, after an absence of about a month, the accused appeared at March Air Force Base and said "he had regained his identity two days before and found himself in a hotel in Hammond, Indiana." He was hospitalized and his condition was diagnosed as follows:

"Conversion reaction, chronic, moderate; manifested by amnesia of approximately 30 days duration; minimal stress, routine military duties; moderate predisposition with history of repeated mild hysterical episodes; minimal impairment."

The accused was released from the hospital as qualified for duty, subject to continuation of psychotherapy on an out-patient basis. The accused was the second witness.

Preliminarily, the accused reviewed his military background, which included two periods of hospitalization for wounds received in combat and the award of the Bronze Star Medal for extricating two soldiers from a burning tank. Turning to the events of November 15, the accused testified he and his wife had reviewed their activities and had tried to refresh their recollections of the particular times involved. His oral statement after his return to military control was the result of the reconstruction. Actually,

he did not recall all his activities. He was positive he was stopped by the Texas Highway Patrol at 10:15 p.m. However, contradicting Officer Robie, he "definitely recalled" that Robie went through the glove compartment of the car "because when . . . [he] got back in the car everything was on the front seat"; he also knew the trunk had been opened "because . . . [he] couldn't see out of the rear mirror." He admitted he had been drinking, but knew he wasn't drunk. Explaining his pretrial statement that it was "possible" he might have committed the offenses charged, he said "I could have done it as well as anybody else." He insisted he had no recollection of, and could not account for, the presence of either of the pistols found in his car.

On cross-examination the accused admitted that the only period for which he could not account was the two to three-hour period between his departure from the Noncommissioned Officers Club at about eight o'clock and the highway patrol incident. He could "vividly" recall his afternoon activities, and he remembered being shown a pistol by Officer Robie about ten o'clock in the evening. He was "almost certain" he told Robie he had acquired a pistol "in Korea on the battlefield late in 1951,"[1] and he did not believe he said he checked it out at the base. To the "best" of his knowledge he threw the gun back under the front seat, but "he could have" thrown it out onto the road. At the time he attempted to sell a gun during his unauthorized absence, he owned no .45 caliber pistol; it was possible that this gun was the one found by Officer Robie.

After both sides rested, the law officer held a conference with counsel to consider his instructions. A question arose as to whether the evidence of intoxication required an instruction on its effect. Defense counsel maintained there was no issue of intoxication because the accused had, in his sworn testimony, denied he had been

---

[1] The date differs from the accused's pretrial written statement to the Federal Bureau of. Investigations agent.

724

intoxicated. As a result, the law officer agreed not to instruct on the effect of intoxication.

Trial counsel requested two instructions. One dealt with the inference of guilt from unexplained possession of recently stolen property. This was granted by the law officer. The second request dealt with the effect of amnesia as a defense to the charges. Defense counsel conceded that amnesia alone did not constitute a legal defense, but he contended the court-martial had a right to consider the fact that accused suffered from amnesia, in connection with the inference which could be drawn from unexplained possession. An extended discussion took place. The following excerpts suffice to explain the arguments:

"DEFENSE COUNSEL: One of the elements which must be present to get to the court is that the possession must be unexplained. Now, it is my understanding of the law that if the possession is unexplained, then you have a question of fact for the court.

"TRIAL COUNSEL: They may believe or disbelieve.

"DEFENSE COUNSEL: True, the point is, after your having presented a prima facie case, the burden of going forward is upon the defense.

"TRIAL COUNSEL: You say you are unable to go forward on that point because of amnesia?

"DEFENSE COUNSEL: Correct.

"TRIAL COUNSEL: That is just what they are saying can't be used as a defense.

"DEFENSE COUNSEL: I am not using it as a defense. Certainly this can be considered as an explanation or non-explanation. You can't saddle us with the burden of going forward and then tell us you have to go forward, and then say you can't do it with amnesia, you are automatically guilty.

"TRIAL COUNSEL: Exactly what they say.

"DEFENSE COUNSEL: Well, I don't care what COMA said. It just can't be. Certainly we are entitled to show the court why we can't go forward.

"TRIAL COUNSEL: You're going in the back door.

"DEFENSE COUNSEL: You will admit that had we presented nothing, the court could bring in a finding of not guilty because they couldn't draw inferences that you want them to?

"TRIAL COUNSEL: Yes.

"DEFENSE COUNSEL: That being the case, I certainly think we can show a reason for our non-explanation of the possession. We are not talking about intent, not talking about a mental condition as being a defense, but a mental condition as explaining why the defense has not gone forward to explain possession.

.    .    .    .    .

"LAW OFFICER: Would this be acceptable to both of you? 'The mental state of amnesia does not, in and of itself, present a legal defense to any of the offenses charged and does not, standing along, [sic] relieve an accused of criminal responsibility.

"TRIAL COUNSEL: Okay.

"DEFENSE COUNSEL: Okay, may I—I should like to suggest to the law officer—let me see that instruction we are going to give about inferences.

"LAW OFFICER: Just a second —all right. Now what?

"DEFENSE COUNSEL: If the law officer would add, starting with the sentence, 'Thus . . .' — page 121. 'Thus, you should consider the nature of the property, the circumstances surrounding the larceny, the lapse of time between the larceny and the time when the articles were found in the exclusive possession of the accused, as well as any evidence which would tend to explain such possession.' I request and tender this further clause as follows: '. . . as well as any evidence which would tend to explain such pos-

session or any evidence which would explain. . . .'—strike that—'as well as any evidence which would tend to explain such possession or why such explanation was not made.'

"LAW OFFICER: Well, that, in effect, is saying that I am instructing that this blackout is genuine— it is up to them to consider that.

"DEFENSE COUNSEL: Granted.

"LAW OFFICER: It's a question of fact.

"DEFENSE COUNSEL: I grant you that, Colonel, but you are telling them that in effect that the property was found in the exclusive possession of the accused, which is a matter of fact also. I am simply saying one of the reasons why this is justifiable is because it is unexplained. If the man were able to explain it in a manner consistent with innocence and the explanation itself was not inherently improbable or the government didn't rebut the explanation, a motion for a finding of not guilty would have to be sustained.

"TRIAL COUNSEL: I agree.

"DEFENSE COUNSEL: So then, one of the important things to this inference is the fact it is unexplained. Now, then, in order to determine the weight, if any, to be given this inference which is their sole, exclusive discretion, well, I think they can properly consider why it is unexplained.

"LAW OFFICER: What wording to [sic] you have in mind.

"DEFENSE COUNSEL: What the reason is for such an explanation not having been made.

.    .    .    .    .

"LAW OFFICER: I don't want to give an instruction that will mislead the court and I don't know if the court will be mis-led by that or not, but it seems to me I am instructing them on something they—well, what I am saying is, this appears to me to be an instruction that they must believe his explanation. That is the impression it leaves with me.

"DEFENSE COUNSEL: The point

**725**

I am attempting to get at is that one of the main reasons why this case is even getting to the court is because it is unexplained. Now, it certainly seems to me. . .

"LAW OFFICER: I don't see any difference why it is unexplained, Lieutenant Criswell. I don't know, maybe I am reading something into this that isn't here. It seems to me this would confuse the court.

"DEFENSE COUNSEL: This is precisely the reason that no instruction on this matter should be given.

"LAW OFFICER: You mean on possession of recently stolen property?

"DEFENSE COUNSEL: Yes, it is only a legal test to determine whether it is proper to let the case to go the jury. I grant you we are up in the air of legal theory in discussing this inference of stolen property.

"LAW OFFICER: This instruction on the effect of recently stolen property is good, I am sure of that.

"DEFENSE COUNSEL: You get into the field of when the inferences disappear and when they don't disappear.

"LAW OFFICER: We are not going to confuse the court on that.

"DEFENSE COUNSEL: I suggest to you, if you are going to instruct the court on it, the defense is entitled to an instruction as to why it wasn't explained.

"LAW OFFICER: Would not that more properly be a matter of argument?

"TRIAL COUNSEL: No, you are trying to use this thing to relieve him from criminal responsibility.

"LAW OFFICER: I will give the instruction as shown. I don't think I will add that requested portion on possession of stolen property without explanation."

At the appropriate time, the law officer instructed the court-martial. Two instructions provide the framework for the accused's claim of error.

"Mention was made by both counsel concerning possession of recently stolen property. If the evidence shows that property was stolen and that the accused has personal, exclusive, conscious and unexplained possession of it or part of it, recently after the occurrence of the larceny, an inference may arise that the accused stole the property. Whether to draw this permissive inference and the weight, if any, to be given to the inference, are matters for your exclusive determination and should be based upon the entire evidence relating to this issue. Thus, you should consider the nature of the property, the circumstances surrounding the larceny, the lapse of time between the larceny and the time when the articles were found in the exclusive possession of the accused, as well as any evidence which would tend to explain such possession. In making your decision you should apply your common sense and your general knowledge of human nature and the ordinary affairs of life. However, if, from the attending circumstances, or from any explanation made as to the possession, or in view of all the evidence, you are not satisfied beyond a reasonable doubt that the property was stolen and that it was the accused who stole the property, you must acquit the accused.

• • • • •

"The question of amnesia has been presented to this court. In that connection you are instructed that the defense has introduced evidence tending to show that the accused is now suffering from amnesia and that he cannot recall certain events which took place on 15 November 1958. The mental state of amnesia does not, in and of itself, present a legal defense to any of the offenses charged and does not, standing alone, relieve the accused of criminal responsibility."

Appellate defense counsel contend it was prejudicial error for the law officer to refuse to include the defense request on amnesia in the instruction on the inference of unexplained pos-

session. They maintain that, as given, the instructions create an inference "based upon the isolated fact of unexplained possession rather than upon all the evidence"; and that they shift to the accused the burden of proving innocence.

Inability to recall past events or the facts of one's identity is loosely described as amnesia. An ■■■■■■■ ■ accused who suffers from amnesia at the time of the trial is at a disadvantage. United States v Olvera, 4 USCMA 134, 15 CMR 134. Failure to recall a past event may prevent the accused from disclaiming the possession of a particular intent, the existence of which is essential for conviction of the offenses charged. Similarly, inability to recall identity can prevent the accused from obtaining evidence of good character from friends and family. Amnesia, however, is, by itself, generally "a relatively neutral circumstance in its bearing on criminal responsibility." United States v Olvera, supra, page 141. If, for example, during the period when he suffers from loss of identity, the accused breaks into a jewelry store and steals some watches, his amnesia, without being connected to some mental disorder, is not sufficient to absolve him from legal responsibility. By the same token, inability to recall his identity would not necessarily interfere with the accused's capacity to cooperate in his defense; consequently, the condition would not bar trial. Like considerations apply to the inability to recall past events. However, when coupled with other circumstances, amnesia can be important. Inability to recall identity might include loss of awareness of being a member of the armed forces; in that situation, amnesia might be a defense to a charge of failing to obey an order given before the onset of the condition, since it would show "the existence of a mental state which would serve to negate criminal responsibility." United States v Olvera, supra, page 141. Amnesia, therefore, can be a defense or a relevant circumstance in evaluating the correctness of instructions by the law officer. Whether it

is depends upon its relevance to, and effect upon, the matters in issue. If it is a circumstance which "might operate to enlighten the court-martial during its deliberation" it should be included in the law officer's instructions, especially when requested. United States v Sandoval, 4 USCMA 61, 69, 15 CMR 61.

Unexplained exclusive possession of recently stolen property permits the inference that the possessor is the thief. United States v Hairston, 9 USCMA 554, 26 CMR 334. The inference, however, is permissible; and whether it should be drawn in a particular case depends upon all the surrounding circumstances. This general principle was clearly recognized by the law officer, but he failed to realize that the showing made by the accused bears significantly upon the weight of the inference.

Complete absence of evidence of acquisition consistent with innocence strengthens the foundation for the inference; conversely, evidence tending to indicate that possession was obtained by means other than that charged weakens the base of the inference. Evidence of amnesia is not, of course, evidence of the means of acquisition of the stolen property. However, if the condition is genuine, the principal—and perhaps in a particular case, the only—course open to the accused is to show its existence and then "analyze rationally the probabilities of his having committed the offense in light of his own knowledge of his character and propensities." United States v Olvera, supra, page 142. That was the course followed here. In the circumstances, it was the "best explanation" the accused could offer to offset the inference. It may not be enough to overcome, in the minds of the court members, other evidence tending to show guilt, such as the shortness of the interval between the theft and the discovery of the stolen goods in the possession of the accused, but it is something for their consideration. As defense counsel pointed out at the trial, to saddle

the accused with the burden of going forward with the evidence, and at the same time hold that his lack of capability to speak has no importance, is tantamount to saying to him, "[Y]ou are automatically guilty." Although trial counsel contended we said "exactly" that in the *Olvera* case, we did not so hold. We were there concerned with amnesia as evidence of mental incapacity as regards the offense charged and as a basis for a continuance. Here, the question is whether the only explanation of possession open to the accused is a matter that can be considered in connection with the inference from unexplained possession. We have already indicated that it is. The law officer, of course, is not bound to marshal every bit of evidence for or against each fact upon which the inference is based, but his refusal to instruct on the defense here presented a one-sided picture which was unfair to the accused. See United States v Nash, 5 USCMA 550, 18 CMR 174; cf. United States v Ball, 8 USCMA 25, 23 CMR 249. The denial of defense counsel's request to instruct on amnesia as a matter bearing upon the weight of the inference, constitutes prejudicial error.

The decision of the board of review as to Charges I and II and the sentence is reversed and the findings as to those charges and the sentence are set aside. A rehearing on the charges and the sentence may be ordered.

Judge FERGUSON concurs.

LATIMER, Judge (concurring in the result):

I concur in the result.

In the case at bar, it apears to me the law officer gave instructions on amnesia which would confuse the court-martial members. While in a proper case his charge on that matter was not technically incorrect, in the posture of the evidence in this record I believe that when he instructed the court that testimony of amnesia had been introduced but that that mental condition did not present a defense or relieve the accused of criminal responsibility, he may have misled the members to conclude amnesia could not be considered for any purpose and particularly in connection with the absence of any explanation of his possession of the stolen property. When the other evidence provided no explanation and the accused came forward with none, he ran the risk that the court-martial members might draw an adverse inference from his possession. However, he should not have been denied the benefit of evidence which supports a justification for his failure to explain. Certainly, if the triers of fact had concluded that accused suffered from amnesia, that fact—while not, as the law officer instructed, a defense in and of itself—may bear on his failure to come forward with any explanation. Since I believe the court may well have concluded otherwise, I join in the disposition ordered.