UNITED STATES, Appellee

v

WILLARD J. DAY, Private, U. S. Army, Appellant

14 USCMA 186, 33 CMR 398

No. 16,672

August 9, 1963

*Captain Charles W. Schiesser* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod* and *Captain Robert L. Brosio.*

*Lieutenant Colonel Francis M. Cooper* argued the cause for Appellee, United ·States. With him on the brief was *Lieutenant Colonel Bruce C. Babbitt.*

## Opinion of the Court

QUINN, Chief Judge:

In November 1962, a general court-martial in Hawaii convicted the accused of larceny of a movie camera, a radio, and some jewelry, from Major Billie L. Brown.[1] It sentenced the accused to a dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for two years. After the conviction was affirmed by a board of review, the accused appealed to this Court. He also filed a petition for a new trial.

At the trial, the Government established that the property set out in the specification of the charge was stolen. It also showed that on the day of the theft, the accused pawned some of the stolen articles. Finally, without defense objection, it introduced into evidence a sworn statement by the accused, made more than a month after the larceny, in which he said that he was "pretty drunk" and did not recall all that transpired. He maintained that in the early evening, he "sat around"

the barracks with Private Gary E. Widell. Later, they left the barracks and "started walking around." The "next thing" he remembered was "going into a Pawn Shop and . . . pawning" the articles. He asserted he did not know where or how he had obtained possession of the property. He acknowledged his signature on the pawn shop's record of the transaction. No evidence was introduced by the defense.

Before the case went to the court-martial, the law officer held an out-of-court hearing with counsel on his proposed instructions. No objections and no requests for changes were presented by defense counsel. Among the instructions given to the court-martial was the following:

"Now, concerning the matter of possession of recently stolen property, if the evidence shows beyond a reasonable doubt that property was stolen and that the accused had personal, exclusive, conscious and unexplained possession of it or a part of the stolen

[1] In May 1962, the accused was convicted on his plea of guilty of house-breaking and larceny. The sentence included a bad-conduct discharge. The discharge was suspended with provision for automatic remission. However, the suspension was vacated after the accused was confined pending disposition of the charges in this case.

property, recently after the occurrence of the larceny, an inference may arise that the accused stole the property at the time and from the place from which it was missing. Whether to draw this permissive inference and the weight to be given the inference are matters for your exclusive determination. It should be based on the entire evidence relating to this issue. Thus, you should consider the nature, the property, the circumstances of the larceny, the lapse of time between the larceny and the time when the articles were found in the exclusive possession of the accused, as well as any other evidence which would tend to explain such possession. In making your decision, you should apply your common sense and general knowledge of human nature and the ordinary affairs of life. However, if from the attending circumstances or from any explanation as to the possession or in view of all of the evidence you are not satisfied by legal and competent evidence beyond a reasonable doubt that the property was stolen and it was the accused who stole it, you must acquit the accused. The term exclusive as I have just used it means of a nature tending to exclude, shutting out, or desiring to shut out from anything. In order that an inference of guilt may be drawn from the unexplained possession of goods recently stolen, it must be an exclusive personal possession on the part of the accused."

On this appeal, the accused contends the instruction is prejudicially deficient because it does not indicate that the accused's intoxication could be considered in connection with the weight to accord the inference flowing from accused's possession of the stolen property. Heavy reliance is placed upon our decision in United States v Boultinghouse, 11 USCMA 721, 29 CMR 537. That case is inapposite.

In *Boultinghouse,* the accused introduced evidence indicating he suffered from amnesic episodes. He testified he could not recall what happened during the period of time important to the offenses charged, and could not, therefore, explain his possession of property

shown to have been stolen. Defense counsel requested the law officer to modify the standard instruction on the inference from possession of recently stolen property to include reference to the evidence of accused's amnesia and its effect on the weight of the inference. The law officer denied the request. In addition, he instructed the court-martial that amnesia did not constitute a legal defense, and did not relieve the accused of criminal responsibility. We held these instructions deprived the accused of the benefit of the explanation he offered to offset the inference from possession. The instructions in this case are different. The accused was not deprived of the benefit of evidence in his favor. The effect of intoxication was related to the offense itself. The court-martial was instructed that to find the accused guilty it must, among other things, be convinced beyond a reasonable doubt he was not so intoxicated as to be unable to entertain the requisite intent. According to the evidence, only a few hours elapsed between the theft and the pawning. The instruction in issue directed the court-martial's attention to the time element. Considering it with the separate instruction on intoxication, there is no reasonable likelihood that the court-martial mistakenly concluded the accused's intoxication was not to be considered on the issue of his guilt or innocence. We find no prejudice to the to the accused in the challenged instructions.

Accused's petition for a new trial is also without merit. It is predicated primarily on affidavits by himself and Widell. Widell says he alone broke into the premises and stole the property. After the offenses were completed, he purportedly asked the accused to pawn some of the stolen articles for him because he "was too young to sign." This is not the first statement on the subject by Widell. Before the accused's trial, he orally stated to a Military Police investigator that the accused had acted with him in committing the offenses. The day after his statement, he made a sworn statement in which he

188

gave the following account of the offenses:

"During the early evening hours of 17 July 1962, Pvt Willard J. DAY and I were setting around in our barracks, both without money. We got to talking about ways of getting some money, so that we could go to town. We decided to walk through the Officers Quarters Area, across from the 1st BG, 35th Inf Quad. We walked down all the streets between Macomb gate and Catci Field looking for a house to get into. We finally came to the last set of quarters on the right side of the last street backing Catci Field. There were no lights on in the quarters and there was no car in the car port. I walked up to the front door of these quarters and knock to see if any one would answer. DAY was at the door with me. We then went to the back door which was next to the carport, this door had only a screen on the upper portion. By the time we arrived at these last quarters it had gotten dark. While stand at the back door we listened to see if we could hear any sounds in the house. I turned the door knob and found that the door was locked. I put my left hand on the side of the door to keep it from rattling and with my right hand, I pushed in the screen at the lower left hand corner. Through the hole in the screen I reached the knob inside and unlocked the door. I first went into the house and looked around and came back out. Then DAY went into the house. DAY was in the house for between 5 and 10 minutes. . . . When DAY came out of the quarters, we walked around. . . . When we got into the barracks DAY took all the stuff he had taken out of his pockets and put it on a bed. . . . We left our barracks somewhere around 2130–2200, 17 July 1962, to go to town. I carried the camera case and had some of the jewelry in my pockets and DAY had the rest of the stuff in his pockets. We walked around Macomb gate and went to the booth outside to catch a ride into Honolulu. It was around 2300 or after when we

got to Hotel Street and we started checking for a Pawn Shop that was open. The only one we found open was directly across the street from the Hubba-Hubba Club. We went into this Pawn Shop where the Movie Camera, Radio and Pearl Ring were pawned, in DAY's name for $10.00. We walked around Hotel Street for while and then we went down to the bus station on Alakea Street to get a bus back to Schofield Barracks. While we were at the bus station, we decided to get rid of the watch and other jewelry that had been taken."

About a month after his written statement, Widell was questioned by Captain William A. Duncan, Jr., in an investigation in connection with vacating the suspension of the accused's earlier court-martial sentence. See footnote 2. He submitted a sworn statement. In it, he said the accused accompanied him to Major Brown's house but did not enter it, and had "had nothing to do with . . . committing larceny"; later, he gave the stolen articles to the accused to pawn for him. This statement was made part of the Article 32 investigation of the charges against the accused. At that investigation, the accused was represented by a lawyer specifically requested by him. The same lawyer represented the accused at trial. Counsel admits he knew of Widell's inconsistent statements; that he talked with Widell on five or six occasions; that he knew Widell had been tried for, and pleaded guilty to, the same offenses; but he decided not to call Widell as a defense witness because he was not sure whether Widell would incriminate or exculpate the accused. It is apparent, therefore, that Widell's present representations do not constitute newly discovered evidence. What is presented in the petition for a new trial is a new tactic, not new evidence. This, alone, is sufficient to deny the petition. See United States v Chadd, 13 USCMA 438, 32 CMR 438.

It is appropriate to note another reason for denying the petition for a new trial. In his pretrial statement the accused swore he was so intoxi-

**189**

cated he did not know how or where he obtained possession of the stolen property. He repeated this assertion to the staff judge advocate in the post-trial interview. Now, however, he swears he got the "stuff" from Widell; and that Widell asked him to pawn it without telling him he had stolen the property. Unless the accused recovered his memory of the events sometime between his conviction and the present petition, he lied in his earlier statements, or he is lying now. The accused's petition is significantly silent on this point. Cf. United States v Bourchier, 5 USCMA 15, 17 CMR 15. Other evidence of falsity appears in Widell's affidavit. In his present affidavit, he says the accused did not accompany him to Major Brown's house. But even in his statement to Captain Duncan, in which he attempted to exonerate the accused, he swore the accused went with him to Major Brown's house. Additionally, Widell now maintains he made the original statements implicating the accused because, when he was arrested, the accused told him he "would like a 208 discharge"; and he asked Widell to "include him in the matter."[2] The request was purportedly made on August 8th or 9th. Yet, on August 29th, the accused swore he knew nothing of the circumstances of his possession of the stolen property; and, after his conviction, he repeated the denial to the staff judge advocate. Considering the numerous inconsistencies and outright contradictions in the statements presented to us, and in the various proceedings in the case, we see no likelihood that the accused's present contentions would probably result in a more favorable verdict for him. United States v Turner, 7 USCMA 38, 21 CMR 164.

The decision of the board of review is affirmed, and the petition for a new trial is denied.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part. I agree that accused's petition for new trial should be denied, but I believe it is important to note that his defense counsel, before making the decision not to call Widell, interviewed that prospective witness. The latter indicated his reluctance to appear, declared he might rely upon his right against self-incrimination, and gave counsel every reason to believe that, if forced to testify, he would implicate the accused. Under the circumstances, it would appear that counsel made a wise decision, and the nature of Widell's "evidence," known at the time of trial, cannot now be found to be newly discovered. Uniform Code of Military Justice, Article 73, 10 USC § 873; United States v Marymont, 11 USCMA 745, 29 CMR 561.

I cannot, however, concur in that portion of the principal opinion which so easily distinguishes our holding in United States v Boultinghouse, 11 USCMA 721, 29 CMR 537, and concludes that accused was not prejudiced by the law officer's failure to call attention of the court-martial to his intoxication and its effect upon his inability to explain his possession of recently stolen property. To me, the issue is one of tailoring instructions to the evidence and, under the circumstances of this case, the failure of the law officer so to frame his advice was reversible error. United States v Jones, 13 USCMA 635, 33 CMR 167; United States v Roberson, 12 USCMA 719, 31 CMR 305.

The theory of the Government in the case before us was the establishment of the accused's guilt through the inferences to be derived from his conscious, unexplained, and exclusive possession of recently stolen property. See United States v Weems, 11 USCMA 652, 29 CMR 468; United States v Ocamb, 12 USCMA 492, 31 CMR 78. This theory, as indicated in the principal opinion, was submitted by the law officer to the court-martial in a charge which properly indicated the members might permissibly draw an inference of guilt from such unexplained possession. The law officer, however, made

---

[2] The accused does not go that far in his own affidavit. He says: "I told him [Widell] before he left that I would like to get out of the Army."

190

no mention of the evidence before the court that the accused was unable, by reason of his intoxicated state, to recall the manner by which he had come into possession of the stolen property, nor did he call the jury's attention to the need for considering such intoxication as bearing on accused's ability to explain such possession. Rather, he contented himself with advising the court that it might give heed to evidence of accused's drunkenness as affecting his mental capacity to entertain the specific intent required for the offenses charged.

In United States v Boultinghouse, supra, substantially the same situation was presented, albeit in that case the accused's inability to explain was premised upon the existence of an amnesic state rather than intoxication. We reversed, pointing out that the law officer erred to accused's prejudice in failing to relate the evidence of amnesia to the latter's ability to explain his possession of allegedly stolen property. We declared, at page 727:

". . . In the circumstances, it [amnesia] was the 'best explanation' the accused could offer to offset the inference. It may not be enough to overcome, in the minds of the court members, other evidence tending to show guilt, such as the shortness of the interval between the theft and the discovery of the stolen goods in the possession of the accused, but it is something for their consideration. As defense counsel pointed out at the trial, to saddle the accused with the burden of going forward with the evidence, and at the same time hold that his lack of capability to speak has no importance, is tantamount to saying to him, '(Y)ou are automatically guilty.' . . . Here, the question is whether the only explanation of possession open to the accused is a matter that can be considered in connection with the inference from unexplained possession. We have already indicated that it is. The law officer, of course, is not bound to marshal every bit of evidence for or against each fact upon which the inference is based, but his refusal to instruct on the defense here presented a one-sided picture which was unfair to the accused. . . . The denial of defense counsel's request to instruct on amnesia as a matter bearing upon the weight of the inference, constitutes prejudicial error."

True it is that the law officer, in Boultinghouse, supra, also advised the court that amnesia, in and of itself, was without legal significance. But that factor did not bear upon our decision. We there ruled that an instruction upon permissive inferences to be drawn from certain basic facts must be tailored to the evidence and must fairly include the defense theory as well as that for which the prosecution contends. In short, as we have on many occasions pointed out, it is necessary to relate the legal rules to the proof in the case, for "generalizations, although correct in the abstract, may mislead the court." United States v O'Hara, 14 USCMA 167, 33 CMR 379; United States v Smith, 13 USCMA 471, 33 CMR 3; United States v Jones, supra. That is precisely what occurred here. The law officer charged the court in general upon the inferences which it was permitted to find from the evidence that accused was inexplicably and consciously in possession of recently stolen property. Yet, he made no mention of the evidence before the court that the accused was not capable of offering any explanation as a result of his drunkenness and consequent inability to recall the manner by which he came into such possession. Such a charge is, intentionally or not, one-sided and, as in Boultinghouse, supra, was tantamount to directing a verdict because accused was incapable of detailing the circumstances of his incriminatory custody. The court-martial need not have accepted his inability to explain as an "explanation," but he was entitled to have it considered and weighed together with the prosecutor's case.

Nor am I convinced of the contrary position by the majority's reliance upon the fact that the law officer separately instructed the court-martial as to the effect of accused's intoxication upon his ability to entertain the specific in-

tents involved in the charges. The question before us is not, as the Chief Judge puts it, whether the court-martial "mistakenly concluded the accused's intoxication was not to be considered on the issue of his guilt or innocence" but whether it affirmatively was required to consider such evidence in connection with the proof regarding possession of recently stolen property. There is no interrelationship between the two instructions or the doctrines which they represent. Indeed, if such a separate instruction on intoxication has any bearing on the case before us, it might more fairly be said to have misled the court into believing that accused's drunkenness should be considered only on the question of his intent in entering the quarters and taking the goods in question. In short, I would hold there is no rational probability that this court-martial realized it must take into account accused's apparent inability to explain his possession of the stolen property when considering the case against him. The lack of such realization, as we noted in United States v Boultinghouse, supra, creates a fair risk of prejudice, and necessitates another trial. As I believe this case cannot be logically distinguished from the situation there presented, I would apply its rationale here.

I would reverse the decision of the board of review and order a rehearing.