UNITED STATES, Appellee

v.

HARRY L. MARRIOTT, Second Lieutenant, U. S. Army, Appellant

4 USCMA 390, 15 CMR 390

No. 4203

Decided May 28, 1954

Lewis Landes, Esq., and CAPT William C. Irby, Jr., U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused in this case appeals from a conviction of larceny in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. The sentence imposed was dismissal from the service, total forfeitures of all pay and allowances, and confinement at hard labor for five years. The convening authority approved the findings and sentence except for the period of confinement which he reduced to two years. The board of review further reduced the confinement to one year but otherwise affirmed. In granting the petition for review we limited our grant to the single issue of whether the law officer erred in not instructing the court-martial on the alleged defense of alcoholic amnesia.

Because we are not concerned with the sufficiency of the evidence to support the findings of larceny, we relate only sufficient facts to present a proper background for developing the principal issue. On May 12, 1953, the victim, Lieutenant Cushing, informed the accused he was going to forward some money home and that he was in possession of $280.00. This sum was folded in a compartment of his wallet. On the following evening the accused and the victim, who were tentmates, re-turned to their tent in the area of the 14th Infantry Regiment in Korea following a card game in which both had participated. Cushing was a winner and the accused was a loser. When the game broke up sometime close to 11:00 p.m., the former put his wallet in the back pocket of his trousers. Both officers had been drinking prior to and during the card game. After undressing, Cushing hung his trousers on a peg near his bed, and he and the accused retired for the night. When he arose the following morning, he checked to see if his wallet was still in his trousers and he found that it was missing. He awakened the accused, who was in his bed fully dressed, and asked him if he was missing any money. The accused stated he was not, and he then arose and the two officers searched the area they had traversed on the previous evening. On the afternoon of the 14th, Cushing found his wallet, discarded in the officers' latrine. On May 22, 1953, Cushing received a call from the accused and, at the latter's request, they met in an isolated area. The accused, while denying any remembrance of taking the wallet, admitted he possessed some $270.00 for which he could not account. He thereupon returned some $314.00 to Cushing and hesitatingly asked him to

drop the prosecution. A complete investigation was conducted and it led eventually to the preferment of charges against the accused.

At the trial, the accused testified that on the night of the loss he had three highballs before dinner and about four or five beers during the card game, but that he was not drunk that evening. His sobriety was confirmed by other participants in the game. He further testified that during the subsequent investigation of the theft he became aware that he had $270.00 for which he could not account, and that he became convinced from this and other circumstantial evidence pointing toward him that he was the one who had purloined the wallet. He stated that he had no recollection of having done so but that he might have taken it without knowledge on his part because on three previous occasions he had blacked out, acted in an unbecoming manner, and was unable to remember any incident involved in his misbehavior. He further stated that his prior lapses of memory were all within a six-month period of time immediately preceding this occurrence. The first prior incident occurred when he overturned his car on the highway following a party at which he had had a few drinks and he asserts that he had no recollection of the accident. The next event happened when, after having consumed two drinks of liquor and a few beers while at Camp Drake, he returned to his quarters, undressed, and urinated in another person's foot locker without any remembrance on his part of having so performed. The last occasion was while he was attending school in Eta Jima. He had been drinking beer at a local cabaret and after leaving he apparently acted in an unseemly manner, but he could not recall where he had been or what he had done. On cross-examination, accused referred to the condition following his drinking episodes as "lapse of memory" and stated he had never been to a doctor for any diagnosis or treatment.

To support the theory of amnesia, the defense called two officers who knew the accused and they testified to having witnessed two of the incidents related by him. Also called was a Lieutenant Nowak who testified as a medical expert. He identified the six different causes of amnesia, and explained briefly the effect of intoxication. He was asked a hypothetical question as to whether the failure on the part of an individual to remember being involved in the overturning of an automobile would "fall within the limits of alcoholic amnesia." The question and answer are of no help to the accused as the doctor testified it could; but he had neither consulted with, nor examined, the accused, and each case must be evaluated individually before an opinion can be formed. No attempt was made to develop more fully the expert's conclusion as to this particular case.

It is the contention of appellate defense counsel that the testimony summarized above raises reasonably the defense of alcoholic amnesia, and that the law officer should have given an instruction on that issue without request. Counsel refer us to the Manual for Courts-Martial, United States, 1951, paragraph 122a, which states:

". . . When, however, substantial evidence tending to prove that the accused is insane (120c) or was insane at the time of his alleged offense (120b) is introduced either by the prosecution or by the defense or on behalf of the court, then the sanity of the accused is an essential issue. If, in the light of all the evidence, including that supplied by the presumption of sanity, a reasonable doubt as to the mental responsibility of the accused at the time of the offense (120b) remains, the court must find the accused not guilty of that offense."

Much of what was said in United States v. Olvera, 4 USCMA 134, 15 CMR 134, and reiterated in United States v. Lopez-Malave, 4 USCMA 341, 15 CMR 341, is pertinent to the question here. In the former case, we held that amnesia without other evidence of mental deterioration was not sufficient to raise a question of sanity for consideration of the court-martial. In specifically dealing with alcoholic amnesia, we stated in part:

"Amnesia due to alcoholism is a

possibility also relevant to the instant case—for it is admitted that the accused and his comrades were to some extent under the influence of intoxicating liquor. The mental condition incident to alcoholic amnesia may conceivably be of such a nature as to muddle the subject's thought processes beyond the point at which he is able to entertain a specific intent or to premeditate. . . . we note that no instruction was supplied by the law officer concerning the significance of alcoholic intoxication with·respect to specific intent, nor as to the existence of the lesser included offense of assault with a dangerous weapon—a crime which required no such intent. . . .

". . . Literally nothing has been brought to our attention which indicates that one who 'blacks out' when drunk is more probably suffering from a 'mental defect, disease or derangement,' within the meaning of the Manual—or indeed that of the law of the civilian community—than one who, however intoxicated, possesses a clear and distinct recollection of events. We are certain indeed that we would be adding an unwarranted gloss to the Manual were we to hold that drunkenness is an excuse for crime, provided only that the accused was sufficiently intoxicated to blot from his mind all memory of the facts of the offense."

We can gloss over any issue on the effect that voluntary intoxication might have on specific intent for the reason that the court-martial was fully instructed on the subject and it resolved any doubt about accused's capacity to form a specific intent against him. The instruction was as follows:

"With respect to the evidence that the accused was intoxicated at the time of the alleged offense, the court is advised that evidence of voluntary drunkenness may be considered as a factor in determining whether or not the accused had sufficient mental capacity to entertain the intent to permanently deprive, in the case of larceny, or the intent to temporarily deprive, in the case of the offense of

wrongful appropriation. The fact that a person is intoxicated at the time he commits an offense does not necessarily show that he was deprived of his reasoning ability, for a person may be intoxicated and at the same time be aware of his acts and their probable consequences. The question raised by the evidence of voluntary drunkenness and presented for the court's determination here, is whether the accused was intoxicated to such a degree as to render himself mentally incapable of entertaining an intent to permanently deprive, in the case of the offense of larceny, or an intent temporarily to deprive, in the case of the offense of wrongful appropriation. If in the light of all the evidence, the court has a reasonable doubt that the accused was mentally capable of entertaining an intent to permanently deprive, in the case of the offense of larceny, or an intent temporarily to deprive, in the case of the offense of wrongful appropriation, the court cannot find the accused guilty of larceny or wrongful appropriation."

On the issue of amnesia it is difficult to believe the confused and unlikely testimony of this accused. In making that observation, we have not overlooked the evidence which accused contends corroborates the previous lapses of memory. While the testimony corroborates the act of defiling a locker, the assertion that a memory lapse was suffered on any, or all three, occasions was supported solely by the accused. We shall, however, for the purpose of this case, assume that there was evidence to support a finding of alcoholic amnesia and, in accordance with the rule we announced in Olvera, supra, reject the assertion that it is a mental defect, disease, or derangement which will excuse the commission of a crime. That assertion clashes head-on with the provisions of the Manual for Courts-Martial, supra, paragraph 120*b* which is to the following effect:

". . . A person is not mentally responsible in a criminal sense for an offense unless he was, at the time, so far free from mental defect, disease, or derangement as to be able

**393**

concerning the particular act charged both to distinguish right from wrong and to adhere to the right. The phrase 'mental defect, disease, or derangement' comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental, as distinguished from the moral, faculties. To constitute lack of mental responsibility the impairment must not only be the result of mental defect, disease, or derangement but must also completely deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the act charged. Thus a mere defect of character, will power, or behavior, as manifested by one or more offenses, ungovernable passion, or otherwise, does not necessarily indicate insanity, even though it may demonstrate a diminution or impairment in ability to adhere to the right in respect to the act charged."

The foregoing quotation announces the general rule, but on the specific point of the effect of drunkenness on legal insanity, the Manual, supra, in paragraph 154*a*(2), goes on to state:

"A temporary loss of reason which accompanies and is part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement is not insanity in the legal sense. It is a general rule of law that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for crime committed while in that condition. . . ."

Psychiatry in Military Law, TM 8–240, section 10*f*, succinctly states that same principle in the following language:

"The law rejects the doctrine that alcoholism not amounting to a psychosis is a disease. For forensic purposes, it is a defect of character, will power, or behavior which is distinguished from mental defect, disease, or derangement (Par. 154*a*(2), and 120*b*, MCM, 1951). The 'drunk' usually knows he is doing something

wrong, even though at the moment he may not care."

To escape the foregoing principles, the accused contends that other similar events portray a life pattern of amnesia which indicates a mental derangement or disease. However, the testimony adduced by accused as to prior losses of memory adds little, if anything, to his cause; and, parenthetically we might add, accused denies he was drunk on this occasion. Those antecedent incidents might confirm alcoholism but they do not establish more than a character defect. Certainly, they do not show a psychosis or any other mental disease. Pertinent to this discussion is the statement found in paragraph 12*e* of the Technical Manual immediately cited above:

"Some persons habitually develop simple amnesia for their behavior while drunk. On the morning after, it is not uncommon for the celebrant to ask if he behaved badly the previous night. There may be complete amnesia in pathologic intoxication. While this sort of amnesia may confirm the diagnosis of alcoholism, it does not exculpate the accused."

An examination of the civilian authorities supports the previous pronouncements of the law. Here, there is no evidence to support a conclusion that the accused has a chronic psychosis caused by alcohol. Neither is there any evidence to support a finding of cerebral deterioration from the same cause. The civilian authorities clearly apply different rules to temporary alcoholic amnesia, standing alone, and a permanent mental impairment caused by long-continued or excessive use of alcohol. Generally speaking, they hold that the former is not a defense to a crime while the latter may be. United States v. McLeod, 83 F Supp 372 (1949); Folks v. State, 85 Fla 238, 95 So 619 (1923); Carty v. State, 135 Ark 169, 204 SW 207 (1918); People v. Keyes, 178 Cal 794, 175 P 6 (1918); Drinkard v. Commonwealth, 165 Va 799, 183 SE 251 (1936); Crews v. State, 143 Fla 263, 196 So 590 (1940); Collier v. State (Okla), 186 P 963, 12 ALR 839. See annotation, p 895. See also Corpus

Juris Secundum, § 70, p 135; 15 American Jurisprudence, § 339 at page 129; Davidson, Forensic Psychiatry, 1952, at p. 10.

In the brief before us, appellate defense counsel rely heavily on the case of Tatum v. United States, 190 F2d 612 (DC App 1951). In our view that case is clearly distinguishable because there, in addition to defendant's testimony that he could not remember, were statements of two police officers and other prosecution witnesses to the effect that defendant did not appear normal, that he behaved strangely, and that he appeared to be in a trance. Also, defendant testified that he might have been doped by the mother of the victim prior to the commission of the crime. Further, there was expert testimony that defendant was not suffering from alcoholic amnesia and so the court must have concluded some other mental disease was in issue. The opinion of the majority of that court held insanity was reasonably raised but relied principally upon the statements and concessions made by Government counsel. It is possible that that court concluded the evidence of intoxication was sufficient to indicate psychosis or delirium tremens. If the basis of that decision is founded on that conclusion, we are in agreement on the law as they are generally considered insanities. If the opinion relies solely on alcoholic amnesia, we adopt a different principle.

From the findings of the court, we must conclude the accused took the wallet. While he has steadfastly contended he did not remember doing so, his acts and conduct loudly proclaim otherwise. Moreover, they establish clearly that within the framework of his mental condition accused was accountable for his wrong. He remembers every detail before falling asleep and those after he awakens; he more nearly describes somnambulism than he does alcoholic amnesia; the $280.00 of the money was secreted in a compartment in the wallet, and accused had been told the victim was in possession of that amount; he told conflicting stories of his acquisition of the money; he was informed of the theft of his tentmate's wallet, yet he was unconcerned about the possible loss of a large sum of money he claims to have possessed; he informed Lieutenant Cushing that on May 17, 1953, he stopped voluntarily at military police headquarters to inform the authorities that he was in possession of $270.00 which he could not account for, but when Cushing suggested a call to verify the story, the accused importuned him not to call; in spite of the fact that he was in possession of a large amount of unaccounted for funds and he had been asked a number of times about the lost wallet, he never mentioned his enrichment; he made no disclosure of that fact until interviewed by a military police officer five days after the loss and then he fixed his excess at $270.00; he arrived at that figure because he understood that was the amount of Cushing's loss; he returned $314.41 and there is no satisfactory explanation as to the $270.00 amount as the record shows that $320.00 was known to have been the amount of the loss; he attempted to explain his inconsistencies in accounting for his own funds by claiming he was lax in handling money; he attempted to avoid detection by disposing of the wallet in a storybook fashion and by secreting the money; finally he desired secrecy in making an adjustment with the victim. Those facts show a realization of having committed an offense and a mental capacity at the time of its commission to plan a way of committing it and to reduce the possibility of detection to a minimum.

All authorities are agreed that amnesia can be the result of a diseased mind, but it can also be the result of moral delinquency which may include no more than an intense desire to forget. For our purposes, it is inappropriate to label them all "temporary insanity." When dealing with alcoholic amnesia, we prefer to adopt a pragmatic approach to the problem and fix the total defense line squarely on a showing that alcoholism has so affected the mind of the person asserting the defense that he cannot distinguish between right and wrong or he cannot adhere to the right. If the consistent use of alcohol has impaired the mental faculties to that ex-

tent it is a defense but otherwise it is not.

From the foregoing, it is clear that the evidence in this case did not raise the question of insanity and the law officer was not in error in failing to instruct on that issue. We find no error in the record, and the decision of the board of review is affirmed.

Judge BROSMAN concurs.

Chief Judge QUINN concurs in the result.