UNITED STATES, Appellee

v

DANIEL S. HERNANDEZ, Airman First Class,
U. S. Air Force, Appellant

20 USCMA 219, 43 CMR 59

No. 22,898

December 24, 1970

*Lieutenant Colonel Norman L. Paul* argued the cause for Appellant, Accused. With him on the brief were *Colonel Bertram Jacobson* and *Major John T. Dorman.*

*Lieutenant Colonel Henry R. Lockington* argued the cause for Appellee, United States. With him on the brief was *Colonel James M. Bumgarner.*

### Opinion of the Court

DARDEN, Judge:

A general court-martial at Ching Chuan Kang Air Base, Taiwan, found the appellant guilty of one specification of aggravated assault and one specification of assault with intent to commit rape. The court sentenced him to a bad-conduct discharge. The findings and the sentence were unchanged during earlier appellate review.

The first of two issues on which the Court granted review was whether the

military judge's instructions on mental responsibility were prejudicially deficient.

At the trial the appellant testified that he had no recollection between the time of his drinking "7 straight shots of cognac" until the time Air Police apprehended him, during which time the offenses occurred. Dr. Martin, a defense psychiatrist, testified, and when asked at the Article 39(a), Uniform Code of Military Justice, 10 USC § 839, session if he had noted any evidence of a mental defect in the appellant during his psychological testing and interview, responded: "No sir, I did not. In fact, his record is strikingly normal." He found no evidence of cerebral deterioration, malfunction, or destruction. "[A]lcohol in combination with his personality defect" caused Hernandez "to not be able to form a specific intent, or adhere to the right," declared the doctor. He believed a derangement present, however, because the appellant had "a specific problem area with relation to women, specifically his mother, which could have been in operation at the time of the act, but would never have manifested itself were he not intoxicated."

The defense psychiatrist gave this testimony during a subsequent out-of-court hearing:

"MJ: . . . By derangement did you mean the character behavior disorder?

"WIT: No sir, I meant that a specific, unconscious problem, a derangement otherwise than personality may have erupted at the time of the severe intoxication.

"MJ: Then you are not talking about derangement, separate from the intoxication aspect?

"WIT: Yes I am. I am speaking of his feelings about women, and internal aggression towards women, under control all the time except in the instance of severe intoxication, a specific problem area separate and aside from diagnosis. Diagnoses are descriptive terms attempting to bring the widely divergent data together, but often does not direct one's attention to a specific problem area. This is often discussed in the field as to what diagnosis means. I would separate my discussion concerning derangement from the diagnosis itself, which is a slightly different thing. To repeat, in the diagnosis I simply grouped all the features I could think of which describes this man all of the time, a passive dependent personality; but when focusing on the specific instance in question I am speaking of derangement in a different way.

"MJ: But are you talking about a derangement which took place as a result of the drinking?

"WIT: No, I'm speaking of derangement chronically present but which is completely under control, but because of the presence of alcohol was released from this control."

In open court the defense psychiatrist gave the following testimony upon direct examination:

"Q. Dr. Martin, based upon your knowledge and experience, based upon your evaluation of Hernandez, do you have an opinion as to whether or not, on the night of 15 May, at about 9:00 P. M. Hernandez was able to distinguish right from wrong and adhere to the right, or had his ability to do that been destroyed because of his intoxication?
"A. Yes.

"Q. What is that opinion?
"A. That the degree of alcoholic intake was sufficient to intoxicate him sufficiently to destroy his ability to distinguish right from wrong and adhere to the right."

In response to examination by the president, the defense psychiatrist responded in this way:

"Q. You expressed an opinion that the amount of alcohol referred to here could impair the faculties of an individual; now is it also possible an

individual could drink this much and still not have mental derangement?

"A. We had a session before court, sir, in which this was discussed slightly differently. The derangement is different from the accused's general personality presentation. The derangement has to do with a specific underlying problem that he has, which I have specified, and this specific underlying problem is what I mean. It is this which erupted because of the intoxication that I am of the opinion gave rise to the act."

But when the military judge invited the psychiatrist's attention to the definition of the phrase "mental defect, disease, or derangement,"[1] the witness responded:

"WIT: According to this, sir, it refers primarily to organic change in the brain and does not apply to my use of the word 'derangement' as a life-long problem which has persisted with Airman Hernandez for many, many years which erupted at the time. To speak of deterioration, destruction or malfunction of the mental faculties is to suggest something different than I am using. I would not use this in the context mentioned here. Answering your question, did he have that at the time; using the word in a new way and assuming it was the direct effect of alcohol on the brain cells, I would say 'Yes'. Now I am using one word two different ways.

• • • • • • •

"Q. Now remember in your prior testimony we talked about this, and I must get it clear because the court is entitled to know and must know whether they are dealing merely with voluntary intoxication, completely drunk and thereby certain acts flowed from it and certain impairment of specific intent, or if they are dealing with legal insanity in the sense that the man had some sort of mental defect, disease or derangement in and of itself, not from voluntary intoxication.

"A. Now I would refer to my original use of the word. When you originally asked me you simply used the word, and there I meant he had a chronic emotional problem which was out of his awareness that erupted as a result of his intoxicated state. I could use the term psychopathological nucleus instead of derangement. This is what I am really talking about."

Although the psychiatrist switched from the use of the term "derangement" to "psychopathological nucleus" he was not questioned extensively on his opinion whether the latter term referred to a disease, defect, or derangement. It is difficult to understand how members of the court, having the ultimate responsibility for determining whether the mental condition of the appellant was a defect, disease, or derangement, could apply such a term when its meaning apparently is not clear to an expert. The military judge believed that the issue of mental responsibility had been raised, and he gave the standard instruction on it. In addition, he included the following instruction:

"A temporary loss of reason which accompanies and is part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement is not insanity in the legal sense. It is a general rule that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for an offense committed while in that condition. However, evidence of any degree of voluntary drunkenness may be introduced for the purpose of raising a reasonable doubt as to the existence of specific intent."

---

[1] ". . . The phrase 'mental defect, disease, or derangement' comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental, as distinguished from the moral, faculties." Paragraph 120b, Manual for Courts-Martial, United States, 1969 (Revised edition).

Appellate defense counsel argue that the insanity defense is raised by evidence that an accused is rendered legally insane as a result of the effect of voluntary intoxication upon a mental defect, disease, or derangement, even though the underlying mental condition in itself does not rise to the level of legal insanity. They concede that if an accused is aware of an underlying mental defect and of the probable effect of voluntary intoxication upon it, application of this rule would be judicially unsound. Cf. Kane v United States, 399 F2d 730 (CA 9th Cir) (1968), certiorari denied, 393 US 1057, 21 L Ed 2d 699, 89 S Ct 698 (1969). In support of their basic argument they cite Gaskins v United States, 410 F2d 987 (CA DC Cir) (1967). This case held that *drug addiction* has probative value in conjunction with evidence of mental illness in determining whether a defendant is criminally responsible for his act. Beyond the difference of drug addiction instead of alcohol, the United States Court of Appeals for the District of Columbia has formulated a mental responsibility standard different from the one that governs military trials. See Durham v United States, 214 F2d 862 (CA DC Cir) (1954). Appellate defense counsel also cite Bryant v State, 122 Texas Crim 385, 55 SW2d 1037 (1933); and People v Cummins, 47 Mich 334, 11 NW 184 (1882). State court decisions are of little assistance, however, in applying the standard that determines the insanity issue in military trials.

In its review of this case, the United States Air Force Court of Military Review made these preliminary observations:

". . . We must, of course, begin with the principle that evidence of voluntary intoxication is never sufficient, standing alone, to raise any issue of mental responsibility. United States v Lewis, 14 USCMA 79, 33 CMR 291 (1963). Similarly, alcoholic amnesia, such as this accused assertedly experienced, does not, by itself, raise such an issue. United States v Marriott, 4 USCMA 390, 15

CMR 390 (1954); United States v Olvera, 4 USCMA 134, 15 CMR 134 (1954). If the issue is to be raised, any such alcoholic amnesia 'must be linked to other evidence—evidence suggesting, in some measure at least, the existence of a mental state which would serve to negate criminal responsibility'. United States v Olvera, supra, at page 141. Finally, although not the subject of specific treatment in any reported military cases of which we are aware, it seems well established in other jurisdictions that an instructional issue of mental responsibility can be raised by evidence showing that intoxication (whether or not accompanied by amnesia) so reacted with an otherwise disordered or deranged mind as to produce a consequential loss of reason rising to the level of legal insanity. See Weihofen, Mental Disorder as a Criminal Defense, at page 125."

The last observation of the Air Force court is the one we must examine to decide whether the principle it refers to is for application in military law. Until now, this Court has not directly addressed this question. The Court's opinion in United States v Olvera, 4 USCMA 134, 139, 15 CMR 134 (1954), indicated that:

". . . We are certain indeed that we would be adding an unwarranted gloss to the Manual were we to hold that drunkenness is an excuse for crime, provided only that the accused was sufficiently intoxicated to blot *from his mind all memory of the facts of the offense.*"

Later in United States v Marriott, 4 USCMA 390, 395–396, 15 CMR 390 (1954), the Court declared:

". . . When dealing with alcoholic amnesia, we prefer to adopt a pragmatic approach to the problem and fix the total defense line squarely on a showing that alcoholism has so affected the mind of the person asserting the defense that he cannot distinguish between right and wrong or he cannot adhere to the right. If the *consistent use of alcohol* has impaired the mental faculties to that

extent it is a defense but otherwise it is not." [Emphasis supplied.]

In the instant case the appellant does not contend that the consistent use of alcohol has impaired his mental faculties.

As we read the testimony of the psychiatrist in this case, he was not contending that chronic drinking had destroyed the ability of the appellant to adhere to the right or that a mental defect had caused the drinking. The psychiatrist's testimony was unclear in many ways, but it plainly indicated that except when the appellant was under the influence of alcohol his underlying mental condition independently was not one that would constitute a complete defense to military crime.

The instructions the military judge gave in this instance were a correct expression of the military ▪ law that applies to the evidence adduced in this case. If the appellant was unable to control his behavior after drinking, this result is true in varying degrees for many persons when they are intoxicated. It is the voluntary nature of the intoxication that causes us to hesitate about adopting the rule urged by appellate defense counsel. Many persons with a low tolerance for alcohol have been held responsible for military offenses they committed while under alcoholic influence and without realizing their threshold of intoxication. So long as the ingestion of alcohol is voluntary it is not apparent that their responsibility should be greater than that of a person with a mental condition—not amounting to a defect—that relaxes behavior controls when the person consumes intoxicants. It is the capacity for choice and control that determines responsibility. If a mental condition and voluntary intoxication do not independently exculpate, the sum of the two does not. Paragraph 154a(3), Manual for Courts-Martial, United States, 1969 (Revised edition); United States v Lewis, 14 USCMA 79, 33 CMR 291 (1963).

The one military case brought to our attention in support of the defense contention here is United States v Schoon-over, No. 19737 (AFBR April 6, 1967, rehearing, October 10, 1967). In that case the issue was a failure of the law officer to instruct, *sua sponte,* on the lack of mental responsibility at the time of the offenses. At the trial the defense strategy was to show a lack of mental capacity to entertain the requisite specific intent. A civilian psychiatrist who testified on behalf of the accused expressed the opinion that the mental problem of the accused was a personality disorder. In that case a majority of the then Air Force board of review held that what is *psychiatrically* diagnosed as a personality disorder may, when all the symptoms are considered, rise to the level of mental defect, disease, or derangement, and when there is some evidence that it has, the accused is entitled to have the issue resolved by the triers of fact. In *Schoonover,* however, there were significant differences from the instant case. Schoonover had a history of excessive use of alcohol, the psychiatrist testified that Schoonover could have committed the offenses without the influence of alcohol, and the psychiatrist testified to his opinion that Schoonover would be dangerous to society if he were released from custody at that time. But without these differences, the *Schoonover* holding that the effect of voluntary intoxication on an underlying abnormality creates an insanity instructional issue is one that we do not adopt.

A second issue granted by the Court relates to the propriety of the admission as stipulated testi- ▪ mony of statements by two security policemen that the appellant showed them the scene of the offenses and that he identified a shirt that was admitted into evidence without proof of compliance with the warnings required by Article 31, Uniform Code of Military Justice, 10 USC § 831, and Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966). During an Article 39(a) session, defense counsel expressly waived this voluntariness issue. Since there was a superfluity of other evidence establishing the scene of the offense and the

presence of the appellant there, this waiver could not have harmed the appellant, even though the existence of such independent evidence would not avoid a reversal if the evidence in question had been admitted despite defense objection. United States v Wilson, 2 USCMA 248, 8 CMR 48 (1953); United States v Tanner, 14 USCMA 447, 34 CMR 227 (1964); United States v Reynolds, 16 USCMA 403, 37 CMR 23 (1966).

The inclusion of unwarned statements in stipulations of expected testimony is not prejudicial where the defense desired that the unwarned remarks of the accused be considered by the court members. United States v Schell, 18 USCMA 410, 40 CMR 122 (1969). Where the voluntariness issue is expressly waived it should be clear that the admission of unwarned statements is not prejudicial.

The decision of the Court of Military Review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree with my brothers that the introduction into evidence of unwarned pretrial statements of the accused is not prejudicial error where the record reflects that the defense desired that the statements be considered by the court members. United States v Schell, 18 USCMA 410, 40 CMR 122 (1969); United States v Gustafson, 17 USCMA 150, 37 CMR 414 (1967). However, I cannot join them in their holding that the military judge's instructions on the issue of sanity were not prejudicially deficient.

Captain Martin, Chief of Psychiatry, 6217th USAF Hospital, testified that in his opinion the accused unknowingly suffered from a mental derangement with regard to women.[1] As he stated during an out-of-court hearing:

". . . I think he has a chronic mental derangement which harps back to the past that came out in this one instance because of the intoxication. Let me, if you don't mind, put a proviso on that. I don't think Airman Hernandez was aware of this, or would ever have manifested it except for his intoxicated state."

Concerning this testimony, the military judge inquired:

"MJ: . . . By derangement did you mean the character behavior disorder?

"WIT: No sir, I meant that a specific, unconscious problem, a derangement otherwise than personality may have erupted at the time of the severe intoxication.

"MJ: Then you are not talking about derangement, separate from the intoxication aspect?

"WIT: Yes I am. I am speaking of his feelings about women, and internal aggression towards women, under control all the time except in the instance of severe intoxication, a specific problem area separate and aside from diagnosis. Diagnoses are descriptive terms attempting to bring the widely divergent data together, but often does not direct one's attention to a specific problem area. This is often discussed in the field as to what diagnosis means. I would separate my discussion concerning derangement from the diagnosis itself, which is a slightly different thing. To repeat, in the diagnosis I simply grouped all the features I could think of which describes this man all of the time, a passive dependent personality; but when focusing on the specific instance in question I am speaking of derangement in a different way.

"MJ: But are you talking about a derangement which took place as a result of the drinking?

"WIT: No, I'm speaking of derangement chronically present but

---

[1] The accused was convicted of one specification each of aggravated assault upon a woman and assault with intent to commit rape upon the same victim.

which is completely under control, but because of the presence of alcohol was released from this control."

In open court the witness advised that in his capacity as chief psychiatrist at the base hospital he had examined the accused psychiatrically on three separate occasions. In addition and at his direction, certain tests were also run upon the accused, including one in which the accused was questioned extensively, while under the influence of Amytal, concerning all the matters contained in the previous interviews. Total interview and testing time was about five hours. He testified, in part, as follows:

"Q. Dr. Martin based upon your knowledge and experience, based upon your evaluation of Hernandez, do you have an opinion as to whether or not, on the night of 15 May, at about 9:00 P. M. Hernandez was able to distinguish right from wrong and adhere to the right, or had his ability to do that been destroyed because of his intoxication?

"A. Yes.

"Q. What is that opinion?

"A. That the degree of alcoholic intake was sufficient to intoxicate him sufficiently to destroy his ability to distinguish right from wrong and adhere to the right.

"Q. Further, do you have an opinion as to the degree the intoxication had affected his ability to form the specific intent to commit rape, or grievous bodily harm?

"A. Yes. His intoxication was sufficient to impair this faculty.

"DC: I have no further questions."

In response to examination by members of the court, the following testimony is pertinent:

"Q [President]. You expressed an opinion that the amount of alcohol referred to here could impair the faculties of an individual; now is it also possible an individual could drink this much and still not have mental derangement?

"A. We had a session before court, sir, in which this was discussed

slightly differently. The derangement is different from the accused's general personality presentation. The derangement has to do with a specific underlying problem that he has, which I have specified, and this specific underlying problem is what I mean. It is this which erupted because of the intoxication that I am of the opinion gave rise to the act.

·　·　·　·　·　·　·

"Ct Mem (Maj Ryland): After making your evaluation of him, and after considering the OSI reports on the alleged incident, in your opinion as a doctor do you think he knew what he was doing, if he did it?

"WIT: This is an opinion. I do not think he knew what he was doing.

"Questions by MJ:

"Q. Doctor, we have gone through this before in our other session. I want to get back to this mental derangement. Now you are aware of the criteria set forth by Air Force manuals and the law as it is, we discussed that?

"A. Yes.

"Q. The phrase—using this as a definition—the phrase 'mental defect, disease, or derangement' comprehends those irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental, as distinguished from moral faculties. In that sense did he have a derangement? Was he suffering from a derangement, using that criteria?

"A. May I read that, please?

"(The military judge handed the witness a copy of Air Force Manual 160–42, Psychiatry in Military Law.)

"WIT: According to this, sir, it refers primarily to organic change in the brain and does not apply to my use of the word 'derangement' as a life-long problem which has persisted with Airman Hernandez for many, many years which erupted at the time. To speak of deterioration, destruction or malfunction of the men-

**225**

tal faculties is to suggest something different than I am using. I would not use this in the context mentioned here. Answering your question, did he have that at the time; using the word in a new way and assuming it was the direct effect of alcohol on the brain cells, I would say 'Yes'. Now I am using one word two different ways.

"Questions continued by MJ:

"Q. Assuming he did have the derangement, did the derangement render him unable to know the particular act charged was wrong?
"A. Using 'derangement' in this sense, and stating that alcohol effected [sic] his brain cells.

"Q. Not using it in the sense of alcohol, using it in the sense of derangement of the mind separate and apart from alcohol?
"A. No sir, you can't do that. Alcohol affects the brain cells and that is the mind.

"Q. Yes, but you are stating then that voluntary intoxication in your opinion would be a derangement.
"A. No sir, I'm saying only that if sufficient alcohol affected sufficient brain cells, it would be a derangement in a sense, using that book.

"Q. Now remember in your prior testimony we talked about this, and I must get it clear because the court is entitled to know and must know whether they are dealing merely with voluntary intoxication, completely drunk and thereby certain acts flowed from it and certain impairment of specific intent, or if they are dealing with legal insanity in the sense that the man had some sort of mental defect, disease or derangement in and of itself, not from voluntary intoxication.
"A. Now I would refer to my original use of the word. When you originally asked me you simply used the word, and there I meant he had a chronic emotional problem which was

out of his awareness that erupted as a result of his intoxicated state. I could use the term psychopathological nucleus instead of derangement. This is what I am really talking about."

Two things are abundantly clear from the testimony of Captain Martin. In his opinion: (1) The accused, unconsciously suffers from a chronic mental derangement of long-standing, which is distinct from his "character behavior disorder" of "passive dependent personality"; and (2) on the night and at the time of the charged offenses, the accused was unable to distinguish right from wrong or adhere to the right. At no time did he deviate from these positions, and, in fact, correctly refused to be fettered by the definitions contained in the Air Force Manual 160–42, Psychiatry in Military Law, utilized by the military judge in his examination of the witness. United States v Schick, 7 USCMA 419, 22 CMR 209 (1956). See also United States v Allen, 11 USCMA 539, 29 CMR 355 (1960) ; United States v Jensen, 14 USCMA 353, 34 CMR 133 (1964). As this Court said in *Allen*, at page 542, "technical manuals promulgated by the armed services play no role in judicial proceedings beyond that accorded ordinary texts."

The Court of Military Review, in this case, in a divided opinion, concluded that the psychiatrist's testimony was equivocal[2] and that the issue of mental responsibility was not even raised by the evidence. The dissenting member was convinced, as was the military judge, that the issue was raised but found that the judge's failure to furnish the court with lucid, explicit guidelines properly framing this defense was prejudicially erroneous. Since I am in agreement with that view, I quote it at length:

". . . The record discloses he [the military judge] gave the standard instructions on mental responsibility and the effect of voluntary intoxication on specific intent. AFM

---

[2] The very fact that the testimony was equivocal makes it all the more necessary that the issue be resolved by the triers of fact under proper instructions.

110-5, Court-Martial Instructions Guide, paragraphs 5-1 and 4-7, 15 May 1967. He also instructed, as follows, substantially in the terms of paragraph 154a(3) of the Manual:

'A temporary loss of reason which accompanies and is part of a drunken spree and which is not the result of delirium tremens or some other mental defect, disease, or derangement is not insanity in the legal sense. It is a general rule that voluntary drunkenness not amounting to legal insanity, whether caused by liquor or drugs, is not an excuse for an offense committed while in that condition. However, evidence of any degree of voluntary drunkenness may be introduced for the purpose of raising a reasonable doubt as to the existence of specific intent.'

"Appellate defense counsel contend that these instructions did not provide the triers of fact with meaningful guidelines with which to determine the basic issue in the case: the consequential effect of intoxication on accused's disordered mind. I agree. Having raised the issue of mental responsibility, the accused was entitled to have the triers of fact specifically and precisely instructed on this matter. United States v Thompson, 12 USCMA 438, 441, 31 CMR 24 (1961).

"As seen, the evidence indicated that neither intoxication nor mental disorder, considered separately, resulted in the accused's temporary loss of reason. Rather, his lack of mental responsibility was caused by a combination of intoxication and mental disorder. In these circumstances, the court should have been instructed that the effect of intoxication was to be considered in determining whether the derangement attained the proportions of a legally exculpatory derangement within the purview of paragraph 120b of the Manual. Cf. United States v Marriott, . . . [4 USCMA 390, 15 CMR 390 (1954)]; United States v Olvera, . . . [4 USCMA 134, 15 CMR 134 (1954)]; Weihofen, . . . [Mental Disorder as a Criminal Defense (1954)], page 125. Lucid, explicit guidelines properly framing this defense were required. United States v Smith, 13 USCMA 471, 33 CMR 3 (1963); United States v Sheeks, 16 USCMA 430, 37 CMR 50 (1966). These were not provided. Instead, the court received propositions of law correct in the abstract but inadequate when applied to the case at hand. Cf. United States v Harrison, . . . [19 USCMA 179, 41 CMR 179 (1970)].

"The instruction, essentially in the terms of paragraph 154a(3) of the Manual, was the sole attempt made to relate mental responsibility and intoxication. From this instruction, the court could have concluded that intoxication is a neutral factor in mental responsibility cases. We have seen that this is not the law and, accordingly, I conclude that the instructional deficiency was prejudicial.

"For the reasons stated, I find the findings of guilty and the approved sentence incorrect in law and would set them aside. I would order a rehearing."

Inasmuch as I too believe that the military judge's instructions on the issue of mental responsibility were prejudicially deficient, I would reverse the decision of the Court of Military Review and direct that a rehearing may be ordered.