**UNITED STATES**

v.

**Shannah L. HENSLER, 276–58–0194 Lieutenant Commander (O–4), U.S. Navy.**

**NMCM 92 00485.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence adjudged 8 Oct. 1991.

Decided 30 Aug. 1994.

LT D.P. Sheldon, JAGC, USNR, Appellate Defense Counsel.

Capt Laulie S. Powell, USMC, Appellate Government Counsel.

Before LARSON, C.J., and WELCH and ORR, Senior Judges.

LARSON, Chief Judge:

This appeal presents the question of whether the military judge was required to instruct the members on *involuntary* intoxication as a basis for the defense of lack of mental responsibility. We find that, while

involuntary intoxication is a recognized basis for lack of mental responsibility under military law, in this case there was insufficient evidence to trigger the duty to instruct the members on this particular defense. Accordingly, we find that the military judge did not err, and we affirm.

Contrary to her pleas, the appellant was convicted of six separate incidents of fraternizing with four enlisted male petty officers—who were all members of a command of which she was the executive officer—by engaging in various forms of sexual activity with three of them and, as to the fourth, drinking alcohol excessively in his company, under Articles 133 and 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 933, 934. She was sentenced to a dismissal. The convening authority approved the sentence as awarded.

I.

The facts concerning the offenses themselves are not in dispute. Soon after reporting to the Navy Recruiting District Command, Pittsburgh, Pennsylvania, as the prospective executive officer in June 1990, the appellant went drinking socially with several members of the command. Record at 84. After several hours of drinking, she and Petty Officer H, who were both in uniform, left together and proceeded to her apartment where they had consensual sexual intercourse. Petty Officer H testified that he was drunk but that he did not know if the appellant was intoxicated. Record at 104. One week later, following a similar social setting, the appellant went home with Petty Officer S where they too engaged in consensual sexual intercourse and oral sodomy, after which S remained the night. In his opinion, the appellant was intoxicated during the evening episode but appeared to be sober the next morning when they awoke and engaged in sex again. At that time, the appellant remarked to S that she had "better not go drinking with the guys anymore.... [L]ast week it was Petty Officer [H], this week it's you." Record at 119.

About one week later, the appellant told Petty Officer S that she wanted to see him again. He went to her apartment, they went out to dinner and to a few bars, and returned to her apartment. They engaged in sexual intercourse, and he spent the night. Record at 123. In his opinion, neither he nor the appellant was intoxicated on this occasion. Upon waking up, the two engaged in consensual sodomy. Some time after this second encounter, the appellant discussed Petty Officer S's Navy future with him in her office. She commented that it would be easier on her if he were to leave the Navy, to which he responded that he would not do that. Later that same day at a local bar, she asked him whether he preferred to "date" her or Petty Officer B (a female petty officer in the command). He responded "Petty Officer [B]." Record at 298–299.

In September 1990, to celebrate a successful recruiting year, the appellant's office personnel went "bar-hopping" again in Pittsburgh. Petty Officer N testified that on three occasions during that evening, the appellant put her hands on him in a manner that he perceived to be sexually suggestive and attempted to kiss him. He rebuffed her advances in each instance, protesting that her actions were not "proper." In his opinion, the appellant was somewhat intoxicated but not totally incapacitated. Both were in uniform. Record at 137–140. Later the next morning, after the party had moved to other locations during the night, the appellant went home in company with Petty Officer H and invited him into her apartment. They engaged in consensual sexual intercourse and oral sodomy. Record at 90–96. In his opinion, neither of them was intoxicated. Before he left, she advised him not to mention what had occurred to anyone. Record at 97.

Finally, in October 1990, while on temporary assignment with Petty Officer L to an outlying recruiting station, the appellant drank to excess one evening. Petty Officer L walked her back to her hotel room where he made sexual advances toward her. She rebuffed his attempts and, in response to his third attempt, fell back on her bed and went "limp." Record at 156–57. He undressed her (without her resistance) and himself and was preparing for sexual intercourse when he suddenly realized the impropriety of the situation and stopped. He got dressed,

pulled the covers over her, and remained in the room for about an hour in case she became ill. The next morning, in response to her question about the prior evening, he assured her that "nothing happened." Record at 158.

## II.

The appellant's defense was lack of mental responsibility. She presented expert medical testimony in an attempt to explain to the fact-finders the confluence of external and internal factors that caused an otherwise successful naval officer with 12 years of outstanding service to engage in such self-destructive and career-killing behavior. All experts agreed that the appellant suffered some degree of psychological impairment during this period in her life; her condition being described with various labels, e.g., borderline personality traits, adjustment disorder, alcoholism, and mood disorder. Record at 195, 247, 264. In the opinion of Dr. Smoller, a civilian psychiatrist who testified for the defense, she had "serious psychological problems," which may have been the result of mental illness passed on from her mother through heredity and/or her upbringing. Record at 263–65. In addition, she suffered from a decreased liver function, the result of a prior bout with hepatitis. This condition affected her body's ability to process alcohol and drug medication with the result that the effects of those substances may have lasted longer than normal. Record at 269.

Despite her psychological background, the appellant had been able to manage her life and pursue her naval career successfully until the spring of 1990 when other external and internal factors came into the picture. First, divorce left her a single mother with orders to a duty station where frequent travel requirements forced her to leave her infant with her own mother in Ohio. Record at 194–45. In addition, she perceived, rightly or wrongly, that she was not welcome at her command by her new commanding officer, and her professional relationship with him was quite difficult. Record at 194, 336, 380.

Finally, she had a history of migraine headaches and, probably as a result of stress induced by the foregoing factors, began an intense treatment regimen in 1990 consisting of the drugs, Bellergal, Prozac, and Darvocet,[1] all prescribed by civilian physicians. Record at 211–13. Every physician who testified as an expert witness agreed that this combination of drugs was unusual and excessive. In the opinion of the Navy neurologist who examined her, prescribing all of them without close monitoring of the patient amounted to medical malpractice. Record at 214. Bellergal and Prozac taken together, in particular, are, according to one psychiatrist, "contra-indicated." Record at 262. In company with Darvocet, they can lead to disorientation and loss of judgment. *Id.*

In the opinion of Dr. Smoller, the above combination of factors produced in the appellant a severe mental defect he diagnosed as "organic brain syndrome." Furthermore, during the time period she committed these offenses, because of the combination of her psychological make-up, the effects of her decreased liver function, the prescribed drugs, and the alcohol, she was, in his opinion, unable to appreciate the nature or the seriousness of her behavior. Record at 269. Two other psychiatrists testified to the contrary position regarding her sanity, i.e., that she was able to appreciate the nature and wrongfulness of her behavior, although they agreed that she suffered some psychological impairment and that the drugs and the alcohol certainly had distorted her judgment. Record at 306, 352.

## III.

The military judge provided the members the traditional instruction on the insanity defense. Specifically, he instructed them that they could presume the accused to be sane unless they were persuaded by clear and convincing evidence that she suffered from a severe mental disease or defect and that, as a result of her severe mental disease or defect, she was unable to appreciate the nature and quality or wrongfulness of her

---

1. Bellergal is partially a barbiturate that depresses the central nervous system; Prozac is a widely-used anti-depressant which also brings relief to some migraine sufferers; and Darvocet is a narcotic pain-killer. Record at 214–15.

acts. Record at 436. He added that the appellant had the burden to establish that she was not mentally responsible. The military judge further instructed the members that intoxication resulting from the compulsion of alcoholism or chemical dependence was not a defense, although voluntary intoxication could raise a reasonable doubt that the appellant knew that the men with whom she was fraternizing were enlisted men.[2] *Id.* The appellant voiced no objection to the instructions given by the military judge, although she did offer her own version of an insanity instruction which he rejected. The proposed instruction directed the members to find the appellant not criminally responsible only if they found that, as a result of the combination of her decreased liver function, chronic psychological problems, and ingestion of prescription medications, she suffered from a delusion that caused her to believe that her behavior was not criminal or that compelled her to commit the offenses.[3] App. Ex. XXXIII.

## IV.

■ A military judge has an affirmative duty to instruct on any defense that is reasonably raised by the evidence. *United States v. Watford,* 32 M.J. 176 (C.M.A.1991). A defense is reasonably raised when there is some evidence to which the members might attach credence. *United States v. Yandle,* 34 M.J. 890 (N.M.C.M.R.1992). Any doubt as to whether the evidence raises a defense should be resolved in favor of the accused. *United States v. Steinruck,* 11 M.J. 322 (C.M.A.

1981). This duty of the military judge arises even in the absence of a specific defense request for an instruction. *United States v. Sellers,* 33 M.J. 364 (C.M.A.1991); *Yandle,* 34 M.J. at 892. Like all instructions to the members, instructions as to defenses must be sufficiently tailored to provide a meaningful legal framework to decide the specific factual issues presented by the evidence. *United States v. O'Hara,* 14 U.S.C.M.A. 167, 33 C.M.R. 379 (1963).

■ Lack of mental responsibility has long been recognized as an affirmative defense in military law. *United States v. Cortes–Crespo,* 13 M.J. 420 (C.M.A.1982); Rule for Courts–Martial (R.C.M.) 916(k). An accused is presumed to be mentally responsible, *see United States v. Oakley,* 11 U.S.C.M.A. 187, 29 C.M.R. 3 (1960), and the burden to prove the absence of mental responsibility falls on the accused by clear and convincing evidence.[4] In this case, evidence of lack of mental responsibility was introduced by the defense, and accordingly, the military judge provided the members with the general instruction as to that defense. The appellant now claims that this general instruction was insufficient because it was not tailored to involuntary intoxication, i.e., it did not include involuntary intoxication as a basis upon which the members may find that the appellant lacked mental responsibility. Furthermore, the appellant asserts that the military judge's failure to distinguish between voluntary and involuntary intoxication (when discussing the effect of the former on her knowledge of the enlisted status of her

2. In the verbatim transcript of the court-martial, the military judge refers to *involuntary* intoxication as affecting the element of knowledge, record at 436, whereas in the military judge's written version of these instruction, which were submitted to the members, the term is *voluntary* intoxication. App.Ex. XXXIV at 9. The first version is incorrect in the members do not have to find the intoxication to be involuntary in order to consider its effect on the element of knowledge. *See* Rule for Courts–Martial 916(*l*)(2). However, even if we assume that the members followed the incorrect spoken version rather than the correct written version, we find that the appellant has suffered no prejudice as a result of this error. The evidence that she knew the enlisted status of the men with whom she fraternized, despite her temporary intoxicated state, is simply overwhelming.

3. The military judge's decision not to use the defense-proposed instruction on lack of mental responsibility has not been assigned as error. Nevertheless, we have examined the contents of the proposed instruction, and we conclude that the military judge acted within his discretion in rejecting it in favor of the standard instruction on lack of mental responsibility. *See United States v. Dubose,* 19 M.J. 877 (A.F.C.M.R.), *petition denied,* 21 M.J. 147 (C.M.A.1985).

4. To carry this burden, the accused must persuade the fact-finder that, at the time of the commission of the offenses, as a result of a severe mental disease or defect, she was unable to appreciate the nature and quality or wrongfulness of her acts. Rule for Courts–Martial 916(k).

fraternizing partners) permitted them to find her guilty even though they may have believed that her intoxicated state was involuntary.

Considering the standards set out above, as well as the appellant's evidentiary burden regarding this defense, we now turn to a discussion of the defense of involuntary intoxication itself. We will then examine the record to determine whether the appellant has met her burden to introduce evidence of this defense to the degree necessary to trigger the military judge's duty to tailor his instructions accordingly.

## V.

 Intoxication that is truly involuntary is generally recognized in the law as sufficient to relieve an accused of criminal responsibility for acts committed as a result of the intoxication. *United States v. Santiago–Vargas,* 5 M.J. 41 (C.M.A.1978); *United States v. Ward,* 14 M.J. 950 (A.C.M.R.1982), *petition denied,* 16 M.J. 94 (C.M.A.1983); *see also* Phillip E. Hassman, J.D., Annotation, *When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge,* 73 A.L.R.3d 195 (1976). That said, the question becomes: when is intoxication "involuntary?" That question is relatively easy to answer when an accused has been drugged or doped without his or her knowledge or, in some other manner, has been forcibly compelled to ingest the intoxicant.[5] Rollin M. Perkins and Ronald N. Boyce, *Criminal Law,* at 1001 (3d ed. 1982). In addition, the phenomenon known as "pathological intoxication"—defined as grossly excessive intoxication given the amount of the intoxicant, to which the actor does not know he is susceptible—has been recognized as a form of involuntary intoxication. *Santiago–Vargas;* Model Penal Code § 2.08(5)(c) (1985). It is also generally accepted that long-term use of alcohol, which has itself

caused a severe mental disease, will absolve the accused of criminal responsibility on the theory that the intoxicated state so induced is no longer "voluntary." *United States v. Marriott,* 4 U.S.C.M.A. 390, 15 C.M.R. 390 (1954). On the other hand, a compulsion to drink that merely results from alcoholism that has not itself risen to the level of a severe mental disease or defect is considered voluntary and will not remove responsibility for a crime committed while so intoxicated. *Id.; United States v. Martin,* 7 M.J. 613 (N.C.M.R.1979).

The question of voluntariness is more difficult to answer when an accused's intoxicated state is the result of any combination of alcohol, prescribed medications, and pre-existing mental illness, as is claimed by the appellant in this case. Several state cases have found unanticipated reactions to prescribed medications to be a valid basis for involuntary intoxication. For example, a violent reaction to Valium, which was both unusual and unexpected, entitled the defendant to a jury instruction on insanity in *Minneapolis v. Altimus,* 306 Minn. 462, 238 N.W.2d 851 (1976). A similar instruction was required based on evidence that the defendant took an excessive dose of medication for migraine headaches, which caused a violent reaction leading to the commission of the charged offense in *People v. Turner,* 680 P.2d 1290 (Colo.1983). Finally, in a case cited by the appellant, the court found that an insanity defense could be based upon the unknowing and unexpected intoxicating effect of the prescribed drug, Halcion, in *People v. Caulley,* 442 Mich. 885, 502 N.W.2d 39 (1993).

By comparison, the federal courts have been much less forgiving, particularly when the triggering substance was alcohol. In *King v. United States,* 372 F.2d 383 (D.C.Cir. 1967), the defendant was not entitled to a directed verdict despite her claim that the

5. However, even in the case of unknowing ingestion of an intoxicant, the defense is not always available. For example, if an accused knowingly consumes an illegal substance—such as marijuana—which has, without his knowledge, been adulterated with another intoxicant—such as phencyclidine—which ultimately causes him to become unaware of the nature or quality of his

behavior, the law does not permit him to claim that his intoxication was involuntary. *Ward.* For this reason, some authorities prefer to label intoxication as culpable or innocent rather than voluntary or involuntary. Rollin M. Perkins and Ronald N. Boyce, *Criminal Law,* at 1001 (3d ed. 1982).

effect of a moderate amount of alcohol on her pre-existing personality disorder, itself the result of organic brain damage, caused her to stab her brother to death. Although psychiatrists testified in *King* that her mental impairment amounted to a serious mental disease, the appellate court found that the jury could have concluded from the state of the evidence that her actions were the product of *voluntary* ingestion of alcohol rather than her mental state. Similarly, in another leading federal case, *United States v. Burnim,* 576 F.2d 236 (9th Cir.1978), the court found that where a defendant suffered from an underlying mental defect (in this case, an organic brain defect) that reached the level of legal insanity *only* when he drank alcohol, he was not entitled to an acquittal based on insanity. To prevail on the insanity defense, the mental disease or defect producing the criminal conduct *must have been brought about by circumstances beyond the defendant's control. Id.* at 238 (emphasis added); *see also United States v. Henderson,* 680 F.2d 659 (9th Cir.1982) (conviction set aside where prosecution failed to meet its burden to prove that defendant's consumption of alcohol was voluntary following expert testimony that his mental disorder caused him to drink).

The most significant case in military law addressing this point is *United States v. Hernandez,* 20 U.S.C.M.A. 219, 43 C.M.R. 59 (1970). Hernandez was convicted of various assaults on women. The evidence revealed that he suffered from an unspecified mental derangement related to his inability to relate properly to women, as well as from a passive-aggressive personality disorder, neither of which was sufficient by itself to render him legally insane. When alcohol was added to the equation, however, his underlying derangement erupted into criminal behavior and, as a result of the combination, he lost the ability to distinguish right from wrong.[6] Based on the psychiatric evidence, the mili-

tary judge instructed the members generally as to the insanity defense but did not tailor his instructions, or specifically refer at all, to the effect of intoxication on this defense. Because the accused was charged with robbery, he also gave a separate instruction regarding the effect of voluntary intoxication on the element of specific intent. A majority of the Court of Military Appeals, with Judge Ferguson dissenting, found the instructions correct, concluding that if a mental condition and voluntary intoxication do not independently exculpate, the sum of the two does not. *Hernandez,* 43 C.M.R. at 63.

## VI.

◼ Applying the points of law identified above, we find that the appellant has not sustained her burden to establish by some evidence that her intoxication was involuntary. We note at the outset that the evidence shows that she was intoxicated during some, not all, of the sexual encounters. As to those episodes where it appears that she was intoxicated, while the experts generally agree that her intoxicated state was the result of a confluence of the factors discussed above, on each occasion it is clear that alcohol was the known common denominator, i.e., the substance that "pushed her over the line." Record at 278. Absent the alcohol factor, the evidence reveals that her behavior appeared to be normal, at least in the opinion of those around her. Record at 337.

Furthermore, there is no evidence that the appellant suffered from "pathological intoxication," even assuming that defense lies in military law. *Santiago–Vargas,* 5 M.J. at 42. In addition, there is no evidence that her chronic use of alcohol had created in her a mental defect such that she could not resist her craving for alcohol. *Marriott.* In fact, the principal expert witness for the defense testified that, in his opinion, she was *not* an alcoholic. Record at 265. Although other

---

6. At the time Hernandez was tried, the standard for mental responsibility was the *M'Naghten* standard, i.e., whether the accused had the ability to distinguish right from wrong and to adhere to the right. *M'Naghten Case,* 10 Cl. & F. 200, 8 Eng.Rep. 718 (H.L.1843). That standard was abandoned for the one advanced by the American Law Institute in *United States v. Frederick,* 3

M.J. 230 (C.M.A.1977), and after additional modifications, it became the standard set forth today in Rule for Courts–Martial 916(k). In our opinion, the differences in the standards for legal insanity between the *Hernandez* case and this one have no bearing on the applicability of the law in that case to the issue presented here.

experts testified to the contrary on that point, none expressed an opinion that her alcoholism had resulted in a severe mental disease or defect. Finally, there is no evidence, on the occasions in question, that she ever had an unexpected or unusual reaction (in the medical sense) to any of the medications she was taking, or that her behavioral reaction to the combination of medication and alcohol was other than the predictable one.

There is evidence that the drug, Prozac, tends to increase the "libido." While this effect, assuming it occurred, may explain to some degree the appellant's sexually aggressive behavior, the testimony concerning it does not support the conclusion that she (or any Prozac patient for that matter) became unable to appreciate the nature and quality or wrongfulness of her behavior as a result. In other words, there was no showing that this particular effect has anything to do with the question of mental responsibility.

Of more significance, the experts agreed that the intoxicating effects of the different prescribed drugs and the alcohol "potentiated" each other, i.e., that the effect of each was magnified by the presence of the others. Record at 217. Furthermore, the testimony as to the appellant's decreased liver function supports a reasonable inference that the intoxicating effect of these substances was magnified by that factor. Record at 379. Finally, there was expert testimony to the effect that it was possible, or even probable, that the appellant was *initially* unaware of the "potentiating" effects of the combination of medication and alcohol on her behavior and, in that sense, her intoxicated state could be described as "involuntary." Record at 358.

Even this evidence offers the appellant no support for her claim that an instruction regarding involuntary intoxication was required. The fact remains that, even with

regard to the first instance of misbehavior, there is no direct or circumstantial evidence that she was actually unaware of the effects of taking this combination of medications and alcohol.[7] Even the defense psychiatrist, Dr. Smoller, never opined that she was probably or even possibly unaware of the effects of alcohol even in her confused mental and emotional state; nor did he suggest at all that her use of alcohol was other than voluntary in any sense of the word. It is clear that the testimony concerning the *possibility* or *probability* that the appellant was initially unaware of the intoxicating effects of the substances in combination was in the nature of a hypothetical discussion of alternative explanations for her behavior. It stands in stark contrast to the evidence supporting the opposite conclusion. First, the Navy psychiatrist who examined her testified to the common practice of warning users of these drugs of the hazards of taking them with alcohol. Record at 306. Second, there is ample circumstantial evidence that she was well aware of her tendency to engage in the charged behavior when she took medication and overindulged in alcohol. Specifically, her comments to Petty Officer S that she should not go "out" with the enlisted men because she tended to end up in bed with them; to Petty Officer H not to tell anyone about what they had done; and to Petty Officer B that it was no one's business whom she saw and that the uniform "didn't matter," all bespeak an awareness of her own behavior and its ramifications. This in turn supports the inference that she knew full well the intoxicating and socially lubricating effects of the substances that prodded her to engage in that behavior. Having such notice, use of these substances cannot be labeled "involuntary." *United States v. Foley,* 12 M.J. 826, 829 (N.M.C.M.R.1981).

Over all, the focus of the testimony on mental responsibility was not involuntary in-

---

7. Contrast this situation with that in *United States v. Henderson,* 680 F.2d 659 (9th Cir.1982), where medical experts testified that the accused's paranoid-schizophrenic personality disorder caused him to drink to excess and, on the occasion when he committed the charged offense, the *prosecution* had not met *its* burden to prove that the alcohol that triggered his insane state was taken *voluntarily.* Here, the burden is on the

*defense* to establish by clear and convincing evidence that she lacked mental responsibility for the offense. *United States v. Lewis,* 34 M.J. 745 (N.M.C.M.R.1991), *petition denied,* 36 M.J. 60 (C.M.A.1992). In the precise context of the issue in this case, we read that burden to require her to prove that the alcohol that triggered her behavior was taken involuntarily.

toxication. In summary, this testimony painted a picture of a troubled young naval officer facing very difficult life crises, who sought refuge in the form of medication and alcohol. It is clear that her choices reflected poor judgment; however, there is nothing to indicate that these choices were other than voluntary. The combination of all external and internal forces that came together at this point in the appellant's life, in the opinion of at least one medical expert, caused her to suffer a severe mental disease or defect, which in combination with her voluntary consumption of prescribed medications and alcohol, produced in her an inability to appreciate the nature and quality or wrongfulness of her behavior. Record at 269. This evidence entitled the appellant to no more than the general instruction on lack of mental responsibility that the military judge provided the members. *Hernandez.*

Accordingly, having concluded that there was no evidence to support an instruction tailored to involuntary intoxication, we find that the military judge's general instruction on the defense of lack of mental responsibility was correct. Moreover, we come to the same conclusion regarding the instruction on the limited effect of voluntary intoxication.[8]

### VII.

In her second assignment of error, the appellant asserts that she was denied due process of law under the Fifth Amendment to the Constitution because her court-martial panel consisted of only six members, with the concurrence of only four required to find her guilty of any offense. This issue has been firmly put to bed by prior case law and therefore is devoid of merit. *United States v. McClain,* 22 M.J. 124 (C.M.A.1986); *United States v. Corl,* 6 M.J. 914 (N.C.M.R.), *aff'd by summary disposition,* 8 M.J. 47 (1979).

### VIII.

In conclusion, we have thoroughly reviewed the evidence and are convinced be-yond reasonable doubt of the appellant's guilt of the offenses of which she was convicted. We also find the sentence to a dismissal from the Naval Service to be appropriate. Accordingly, the findings and the sentence, as approved on review below, are affirmed.

Senior Judges WELCH and ORR concur.

**8.** We should add that, had there been evidence of involuntary intoxication sufficient to trigger an instruction on that defense, the appellant's concern that the instruction given on voluntary intoxication would mislead the members would have been well founded. When evidence of in-voluntary intoxication is introduced, it is essential to distinguish it from voluntary intoxication through proper instructions and, in particular, to avoid reference to the generic term "intoxication" without defining it as one or the other.